364 A.2d 665

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Phillip ROBINSON, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued March 30, 1976.

Decided Oct. 8, 1976.

576

578

Cecil B. Moore, Philadelphia, for appellant.

Ralph B. D'Iorio, Asst. Dist. Atty., Chief, Appeals Div., Vram Nedurian, Jr., Asst. Dist. Atty., Newtown Square, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

Appellant Phillip Robinson was convicted by a jury in Delaware County of murder of the first degree in the death by shooting of Louis Ortiz and of two counts each of assault and battery, aggravated assault and battery, and assault and battery with intent to kill in the shootings of Robinson's estranged wife, Vicky Hernandez Robinson, and her employer, Frank Harris, the manager and bartender of the establishment where she worked as a part-time waitress. He was also convicted of carrying a firearm without a license and of carrying a concealed deadly weapon with the intent to use it to harm another person. These appeals followed the denial of posttrial motions and the imposition of sentences.[1]

Initially, Robinson asserts that the evidence adduced at his trial was insufficient as a matter of law to convict him of murder of the first degree. The well-established test for determining the sufficiency of the evidence for a criminal conviction is "whether, viewing all the evidence admitted at trial in the light most favorable to the Com-

---

1. Robinson was sentenced to life imprisonment on the murder conviction and to lesser and suspended sentences on the other convictions. Our jurisdiction with respect to the murder conviction is pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.202 (Supp.1975–76). An appeal of the assault and battery convictions was taken to the Superior Court and then certified to this Court for consolidation with the murder appeal. The firearm convictions were not appealed.

monwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Bastone,* 466 Pa. 548, 353 A.2d 827, 829 (1976). Viewed in this light, the evidence reveals the following pertinent facts.

At the time of the events in question, Robinson and his wife were separated, but he had repeatedly threatened to kill her if she did not return to him. On the evening of May 26, 1973, he arrived at the bar where she worked and indicated his desire to see her. When informed that she was late for work, he engaged her employer, Harris, in a conversation during the course of which he accused Harris of having an affair with his wife, which Harris denied. When Mrs. Robinson subsequently arrived, Robinson attempted to speak with her, but she ignored him and went into the office to hang up her coat. When she returned to the bar, her husband again attempted to talk to her, but she told him that she had to work. At this point Harris came out of the storage room and asked Robinson to leave his wife alone because she had a job to do. Robinson replied that he was "not going to start any trouble in your place of business" and walked out the door.

A patron of the bar who was seated near the window, however, observed Robinson removing an object from the glove compartment of his parked car, and, within three or four minutes, Robinson returned with a gun in his hand, walked up to the bar, and asked Harris what he was going to do now. He then turned to his right and shot Ortiz, a customer who was seated on a nearby barstool. As Ortiz attempted to rise, Robinson shot him again. He next shot his wife in the shoulder as she attempted to flee and shot Harris in the back as he attempted to come to the aid of Mrs. Robinson. Robinson pulled his wife, bleeding profusely, toward the door. She begged him not to shoot again, but he repeated three

times the words, "I told you I would kill you." He placed the gun against her heart, but she managed to twist loose as he shot again, and the bullet entered under her left arm. She fell to the floor, and, as she attempted to rise, he shot her again in the right side and fled the premises.

Robinson was subsequently apprehended in his car by the police after an extensive chase. On the seat beside him was a .25 caliber automatic revolver which was then unloaded but cocked. He was taken to the Crozier-Chester Medical Center to be identified by the victims. When his wife identified him, he looked at her and said, "Die." Mrs. Robinson and Harris eventually recovered from their wounds. One of the bullets which struck Ortiz, however, caused severe damage to the spinal area and left his legs paralyzed. After an operation during which one bullet was removed from his thoracic spine and another from his leg, his vital signs were good, and he was subsequently transferred to the Veterans Administration Hospital in Wilmington, Delaware, for further treatment. He died there on June 11, 1973.

An autopsy revealed that over an inch of Ortiz's spinal cord had degenerated and his lungs had filled with fluid. The doctor who conducted the autopsy opined that the swelling caused by the gunshot wound had interfered with the blood supply to the spinal cord, and that this in turn had caused a gradual paralysis of the respiratory muscles so that the "actual mode of death was probably a respiratory one." He stated he was certain the gunshot wound was the cause of death.

In order for Robinson to be convicted of murder of the first degree for the death of Ortiz, the evidence must be sufficient to prove beyond a reasonable doubt that the death resulted from a "wilful, deliberate and premeditated killing" [2] perpetrated by Robinson. It is contended

2. This requirement for a non-felony murder of the first degree is contained in both the statute in effect at the time of the shooting

this evidence was insufficient both to prove the requisite willfulness, deliberateness, and premeditation in the shooting of Ortiz, and the requisite causal relationship between his own actions and Ortiz's death. We disagree.

It is argued that the evidence with regard to Ortiz "showed at best that defendant fired at random." Certainly the evidence of malice aforethought and specific intent to kill was stronger with regard to the shootings of Mrs. Robinson and Harris, who did not die, than it was with regard to that of Ortiz, who did. Aside from the evidence of the shooting itself, there was no direct evidence that Robinson was antagonistic toward Ortiz or indeed that he was even aware of his existence.[3] The evidence, however, clearly does not indicate that Robinson fired at random when he shot Ortiz. Rather, Harris testified that Robinson turned to his right, pointed the gun at Ortiz and fired, and that, after both Ortiz and the stool on which he was sitting toppled to the floor, Robinson shot him again as he tried to get up. The evidence is uncontroverted that Ortiz was indeed shot twice. From these facts the jury could properly find beyond a reasonable doubt the specific intent to kill necessary to convict appellant of first-degree murder. As this Court has previously stated: " 'The use of a deadly weapon directed at a vital organ of another human being justifies a factual

—Act of June 24, 1939, P.L. 872, § 701, *as amended,* 18 P.S. § 4701—and that in effect at the time of Ortiz's death—Act of December 6, 1972, P.L. 1482, § 1(a), formerly codified as 18 Pa.C.S. A. § 2502(a) (1973). The present version of the Crimes Code simply describes a criminal homicide as constituting murder of the first degree when "it is committed by an intentional killing," but it further defines an intentional killing as "willful, deliberate and premeditated." 18 Pa.C.S.A. § 2502(a) (Supp.1975–76).

3. One eyewitness testified that, after Robinson returned to the bar with the gun and just before the shooting began, he appeared to exchange words with one of the customers seated at the bar; the witness was unable to say whether this apparent exchange was with Ortiz. This incident was not corroborated by either Harris or Mrs. Robinson, both of whom testified at the trial and both of whom would have been in a better position to observe it.

presumption that the actor intended death unless the testimony contains additional evidence that would demonstrate a contrary intent.'" *Commonwealth v. Bricker,* 458 Pa. 367, 371–72, 326 A.2d 279 (1974), quoting from *Commonwealth v. Alston,* 458 Pa. 412, 416, 317 A.2d 229, 231 (1974). In the instant case there was no additional evidence demonstrating a contrary intent. Rather, the evidence that Robinson shot Ortiz twice, with an interval between the two shots,[4] established the inference of a specific intent to kill—willful, deliberate and premeditated. It is well-settled that the period of premeditation necessary to form the requisite specific intent may be very brief. *Commonwealth v. Carroll,* 412 Pa. 525, 194 A.2d 911 (1963); *Commonwealth v. Earnest,* 342 Pa. 544, 21 A.2d 38 (1941); *Commonwealth v. Drum,* 58 Pa. 9 (1868). In addition, although proof of a motive is not necessary to establish a specific intent to kill, the jury from the testimony might reasonably have inferred that Robinson deliberately intended to vent his malice toward his wife and Harris, both of whom had indicated to him before he left to get his gun that he was interfering with the bar's business, not only against them directly, but against a customer of the bar as well.

■  Next, because the physician who operated on Ortiz and treated him subsequently at the Crozier-Chester Medical Center testified that the patient's vital signs were good after the operation and that his condition was subsequently good enough for him to survive a transfer to the hospital in Delaware, and because "the Commonwealth failed to produce one scintilla of evidence concerning any event from the transfer of Louis Ortiz from Crozier-Chester Medical Center to the Veterans Hospital in Wilmington, Delaware to the actual autopsy," Robinson argues that the evidence was insufficient to prove

4.  There was no evidence presented as to which of the two shots struck Ortiz in the back and which caused the non-fatal wound in his leg.

beyond a reasonable doubt that the gunshot wound he inflicted upon Ortiz caused his death. Robinson overlooks, however, the additional testimony of the doctor who performed the operation that, though Ortiz's vital signs were good after the operation, the severity of his injury had left him in "a very fragile condition," and that the doctor had not been surprised to learn that Ortiz had subsequently died in Delaware. Further, the doctor who performed the autopsy not only concluded with certainty that the gunshot wound was the cause of death, but he supported this conclusion with extensive testimony of his findings and the reasons for his conclusion and indicated that he had found nothing inconsistent with it.

This Court has upon occasion found medical testimony too uncertain to establish criminal causation beyond a reasonable doubt. See *Commonwealth v. Embry,* 441 Pa. 183, 272 A.2d 178 (1971); *Commonwealth v. Radford,* 428 Pa. 279, 236 A.2d 802 (1968). It is clear, however, that where there is medical testimony that establishes the chain of causation with the degree of certainty found in the instant case, the evidence is sufficient for the jury to find the requisite causation beyond a reasonable doubt, and that the Commonwealth is not required to prove that a merely hypothetical supervening event did not take place. See *Commonwealth v. Williams,* 450 Pa. 158, 299 A.2d 643 (1973). Further, even where there is evidence tending to show an independent supervening cause of death, the jury is not required to accept it if there is also sufficient evidence that the accused caused the death. See *Commonwealth v. Webb,* 449 Pa. 490, 296 A.2d 734 (1972). Moreover, even if the wound inflicted by the accused is not in itself mortal and a subsequent event is found to be the immediate cause of death, the accused does not escape legal liability if his act started an unbroken chain of causation leading to the death. *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d

600 (1973); *Commonwealth v. Carn,* 449 Pa. 228, 296 A.2d 753 (1972).

In the instant case there was no evidence whatsoever tending to show the sort of supervening cause that would absolve appellant of liability for Ortiz's death and substantial evidence indicating that he had caused it. At trial the defense offered the testimony of Dr. Fillinger, the assistant medical examiner of Philadelphia, who, after examining the medical records alone, stated that he was unable to give an opinion as to the cause of death "from the information supplied to me." In addition, defense counsel was permitted to argue extensively to the jury that the gaps in testimony between Ortiz's departure from the hospital in Chester and the autopsy in Wilmington created a reasonable doubt about the cause of death. Clearly the jury rejected this argument, which it was certainly justified in doing, given the weight of the medical testimony as to causation presented by the Commonwealth. Cf. *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1976). For the same reason, we reject the related argument that because of the insufficient evidence of causation, Pennsylvania courts lack jurisdiction with regard to Ortiz's death in Delaware.

Robinson's next contention is that he was convicted in part on the basis of the incompetent testimony of his wife, and that the admission of this testimony by the trial court was error not harmless beyond a reasonable doubt. The Act of May 23, 1887, P.L. 158, § 2(b), *as amended,* 19 P.S. § 683, provides in pertinent part: "Nor shall husband and wife be competent or permitted to testify against each other . . . *except that . . . in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other . . . each shall be a competent witness against the other . . . .*" [Emphasis supplied.] It is conceded that the quoted exception contained in the statute made the wife competent to testify to Robinson's alleged acts

of violence directed against her, but he maintains that her testimony "transcended these bounds" since she was also permitted to testify to acts allegedly directed against Ortiz and Harris, as well as to "privileged intra-marital communications and conversations."

This Court has not previously had occasion to determine whether the pertinent exception in the statute extends a wife's competency to testify against her husband to testimony relevant to alleged criminal conduct by the husband directed against third persons which is part of the same episode or transaction which includes the alleged bodily injury or violence directed by him against her. In *Commonwealth v. Clanton*, 395 Pa. 521, 528, 151 A.2d 88, 92 (1959), where the evidence was that as part of a continuous episode a man had shot both the woman he thought to be his wife and her paramour and where he was subsequently tried only for the murder of the paramour, we expressed reservations as to whether the language of the act could be construed to permit a wife to testify against her husband, even though "the shooting of the victim and of defendant's wife alleged is  .  .  . so interwoven as to be actually one event." We held, however, that we did not need to determine the alleged wife's competency under the statute because the uncontradicted record indicated that the putative husband and wife were not lawfully married.

In the instant case, there is no question of the marital status of the Robinsons, but here, unlike *Clanton,* the husband was tried in a single proceeding for his acts against his wife as well as for other criminal conduct arising out of the same episode. The language of the statute clearly makes a wife competent to testify against her husband "in any criminal proceeding" against him for bodily harm or violence directed against her; it does not restrict that competency to testimony relevant to his alleged criminal conduct toward her and thereby make

testimony otherwise relevant to the proceeding incompetent.[5]

Moreover, there can be no question that all the testimony objected to instantly was indeed relevant to the alleged violence directed against the wife; *a fortiori* it was competent in a trial in which appellant was tried for this conduct. Mrs. Robinson testified that her husband had words with her when she entered the bar, and that he subsequently returned, waved the gun at Harris, shot Ortiz twice, shot her, shot Harris, and shot her twice more. Clearly her husband's actions with regard to Ortiz and Harris were inextricably part of the res gestae of the violence directed against her, about which she was plainly competent to testify.[6] Cf. *Miller v. State,* 78 Neb. 645, 111 N.W. 637 (1907). As for the allegedly "privileged intra-marital communications and conversations" testified to by Mrs. Robinson, even were we to regard these threats and expressions of ill will as

5. Robinson argues that the charges arising out of his alleged conduct toward his wife should have been severed, pursuant to Pa. R.Crim.P. 219(d). He made no timely motion for a severance, however, and accordingly has waived the issue. Cf. *Commonwealth v. Von Smith,* 457 Pa. 638, 326 A.2d 60 (1974). We therefore need not here determine whether it would have been an abuse of discretion for the trial judge to deny, or to grant, such a motion in this case, or whether Mrs. Robinson would have been competent to testify against her husband in a separate trial of the other charges against him arising out of this episode. We note, however, that a unanimous Supreme Court of New Jersey, interpreting a similar evidentiary statute of that state, has held both that a denial of such a motion was not an abuse of discretion and that "[i]f there is a single criminal event in which [the wife] and others are targets or victims of the husband's criminal conduct in the totality of the integrated incident and formal charges are made against the husband for some or all the offenses committed (one of which charges is for an offense against the spouse), the wife should be a competent and compellable witness against her husband at the trial of all the cases regardless of whether they are tried separately or in one proceeding." *State v. Briley,* 53 N. J. 498, 506, 251 A.2d 442, 446 (1969).

6. We note also that her testimony about these actions was corroborated at trial by other eyewitnesses and was otherwise uncontroverted.

intrinsically such communications,[7] here they were clearly relevant to establishing Robinson's malice toward his wife.

As we stated in *Commonwealth v. Wilkes*, 414 Pa. 246, 251, 199 A.2d 411, 413 (1964), cert. denied 379 U.S. 939, 85 S.Ct. 344, 13 L.Ed.2d 349 (1964), "[t]he prohibition against the giving of testimony by one married party against the other is based upon consideration for preserving domestic peace, harmony and the sanctity of the marriage. Obviously, no such consideration precludes the exposure of the evidence involved." Similarly, we find no error in the admission of the objected-to testimony in the present case.

Robinson's final complaint is more troublesome. He asserts that when the trial court refused to grant him a continuance because of the unavailability of his privately-retained counsel, it thereby deprived him of his constitutionally-protected right to counsel. For a proper understanding of this issue, the facts underlying the contention need to be set forth in detail.

After his arrest, Robinson retained Cecil B. Moore, Esquire, of Philadelphia, as his counsel, and Attorney Moore represented him at a preliminary hearing before a magistrate in Delaware County on September 6, 1973. The record, however, indicates that thenceforth through the eventual conclusion of the trial itself Robinson had no further personal contact with Attorney Moore whatsoever.[8] On December 10, 1973, because of the pending presentation of the charges against Robinson to the grand jury and because Attorney Moore had not en-

---

7. We note that Mrs. Robinson testified that her husband confirmed his earlier threats during the incident in the bar, and that his subsequent statement expressing his desire that she die was made in the presence of a policeman and testified to at trial by him as well. These were thus hardly confidential communications.

8. Robinson stated to the court that he and Attorney Moore had communicated indirectly through Robinson's sister.

tered his appearance as counsel, the court directly advised Robinson of his right to counsel and suggested that he be interviewed by the public defender's office in order that (1) "you are represented either by Mr. Moore or some other competent attorney" and (2) "that your case will go to trial promptly so there will be no question about denial of your right to a speedy trial." The court added: "If you are satisfied in your own mind that Mr. Moore cannot or will not represent you, you are free to obtain another lawyer of your own choice; provided that your lawyer will be available when he is supposed to be here. That is all we ask."

On December 14, 1973, upon being advised that Robinson had refused to cooperate with the public defender, the court on its own motion appointed James P. McHugh, Esquire, an experienced trial lawyer, to represent Robinson and prepare his case for trial and explained to Robinson that "we have an obligation to you as a human being and as an individual citizen of this country to make certain that you have adequate counsel provided you so that your case can be tried forthwith." The court, however, emphasized that "if Mr. Moore comes out and prepares himself for this trial and is prepared to try it at the time of trial, then of course we will permit him to do so." Robinson indicated that this was clear to him, but he stated that he already had a paid lawyer. The court granted him an exception to its action. On January 15, 1974, Attorney Moore entered his appearance for Robinson. The case was listed for trial on March 24, 1974.

That morning the trial judge announced to Robinson and his appointed counsel that he had received a letter from Attorney Moore stating he was presently involved in a trial in Montgomery County and requesting a continuance or postponement of Robinson's trial. Both Attorney McHugh and the District Attorney objected, indicating that they were ready to go to trial. Attorney

McHugh stated that he had "done everything necessary and proper to prepare the case for trial without the cooperation of the defendant himself." He indicated that he had written Attorney Moore asking him to advise Robinson to cooperate, but that the letter had been returned by the post office with the notation that Attorney Moore had moved; telephone calls were also unavailing. He added that he also had written Robinson and explained the situation, but Robinson had refused to speak with him about the case. Robinson stated to the court that he did not wish to go to trial without his paid lawyer, Cecil Moore. Thereupon, the judge postponed the trial until the first week in June. In response to Robinson's question whether he had the right to choose his own lawyer, the judge replied:

"You do, within reason. You have to choose a lawyer, Mr. Robinson, who is able to represent you. If you choose a lawyer who is so busy that he can't even come out and talk to you, then you better get another lawyer, or accept the lawyer appointed by the Court."

He then advised Robinson that "you better contact Mr. Moore and tell him that if he wants to earn his fee he ought to get in touch with you because the case is going ahead." He further directed the court administrator to get in touch with Attorney Moore well in advance of the next trial date to ascertain his availability at that time.

When the case was again called for trial on June 3, 1974, Attorney Moore was again absent. The court administrator stated that the previous week his office had telephoned Attorney Moore's office and been informed by a secretary that the case was listed in the attorney's appointment book, but that today he had called repeatedly and received no answer at the Moore office. The District Attorney stated that he had written Attorney Moore to inform him of the new trial date and indicated to him that, if he did not appear, the trial would go on with Attorney McHugh. Since Attorney McHugh, assuming

that Attorney Moore would appear, was also unavailable on June 3, the court continued the case to the next day. On June 4, Attorney Moore was absent once more, and all attempts to contact him and his office again proved fruitless. Although Attorney McHugh was now again ready to try the case, Robinson still refused to cooperate with him and continued to insist on his right to have his case tried by the attorney he had paid, even though he had not communicated directly with him since the preliminary hearing. The court nevertheless ordered the trial to proceed with Attorney McHugh as defense counsel. Robinson indicated that, though he understood the court's advice that he cooperate with Attorney McHugh, he did not "want to agree" with it, and that he would insist on his right to remain silent. The court entered a plea of not guilty, and the trial commenced on the following day. The record indicates that throughout the trial, which lasted from June 5 through June 8, Robinson did not communicate directly with Attorney McHugh;[9] it does not indicate that Attorney Moore communicated with either his client or the court.[10]

On June 11, 1974, Attorney McHugh filed post-trial motions raising the issues previously discussed in this opinion. On June 12, Attorney Moore filed post-trial motions of the boilerplate variety, but he was not present to support his motions on the date set for argument. After Attorney McHugh argued the post-trial motions and brought this appeal, Attorney Moore separately

9. The record does indicate that Robinson communicated indirectly through an associate of Attorney McHugh with regard to the selection of the jury.

10. In this appeal, Attorney Moore asserts that on June 3 he filed a "busy slip" with the court indicating that he was unavailable because he had been ordered by this Court to cut down his backlog of cases in Philadelphia. The record, however, lends no support to this assertion and clearly shows that, in any event, the court was unaware of this information.

briefed and argued this right-to-counsel issue on Robinson's behalf.[11]

Whatever the suggestions in the record of Attorney Moore's irresponsibility toward both his client and the trial court in the instant case,[12] our analysis must focus not on the conduct of Attorney Moore but on the question of whether, in these circumstances, the trial court, in requiring Robinson to be tried with court-appointed counsel rather than the counsel of his choice, did indeed deprive him of his constitutionally-guaranteed right to counsel. That Robinson has such a right is, of course, unquestionable. It is clear, however, that a person's right to be represented by the counsel of his choice is not absolute. See, e. g., *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896 (1975). In *Moore v. Jamieson,* 451 Pa. 299, 308, 306 A.2d 283, 288 (1973), this Court specifically held that the right of the accused to choose his own counsel, as well as a lawyer's right to choose his clients, must be weighed against and may be reasonably restricted by "the state's interest in the swift and efficient administration of criminal justice."[13] Although the accused may personally elect to waive his right to a speedy trial, he clearly cannot be permitted to utilize his right to choose his own counsel so as *unreasonably* to clog the

11. Although this issue was not discussed in the opinion of the trial court denying the post-trial motions, because appellant at the post-trial argument personally renewed his assertion that he had been deprived of his right to counsel we find that the issue has been preserved for appellate review. Cf. *Commonwealth v. Bailey,* 463 Pa. 354, 344 A.2d 869 (1975).

12. "A lawyer shall not . . . [n]eglect a legal matter entrusted to him." Code of Professional Responsibility, Canon 6, DR 6–101(A)(3).

13. Robinson argues that Article I, Section 9 of the Pennsylvania Constitution, which provides that "[i]n all criminal prosecutions the accused hath a right to be heard by himself and his counsel," confers an absolute right to the counsel of one's choice, in contrast to the Sixth Amendment of the Federal Constitution. He cites no authority for this proposition, however, and we herein explicitly decline to adopt it. See *Moore v. Jamieson,* supra.

machinery of justice and hamper and delay the state in its efforts to do justice with regard both to him and to others whose rights to a speedy trial may thereby be affected. *See Commonwealth v. Grant,* 229 Pa.Super. 419, 323 A.2d 354 (1974); *Commonwealth v. Stiles,* 229 Pa. Super. 411, 323 A.2d 841 (1974); *United States v. Merriweather,* 376 F.Supp. 944 (E.D.Pa.1974). The question thus becomes one of due process, and in the words of one court:

"Due process demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his own choice to prepare and conduct his defense. The constitutional mandate is satisfied so long as the accused is afforded a fair or reasonable opportunity to obtain particular counsel, and so long as there is no arbitrary action prohibiting the effective use of such counsel. The conclusion becomes inescapable, therefore, that although the right to counsel is absolute, there is no absolute right to a particular counsel." [Footnote omitted.]

*United Sates ex rel. Carey v. Rundle,* 409 F.2d 1210, 1215 (3d Cir. 1969), cert. denied 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970).

In holding that a state trial judge did not violate due process when he denied the defendant in a criminal contempt hearing a continuance which would have enabled him to have the services of his chosen counsel, the Supreme Court of the United States has indicated that careful attention must be given to the circumstances of each particular case:

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. . . . Contrariwise, a myopic insistence upon expeditiousness in the face of a

justifiable request for delay can render the right to defend with counsel an empty formality. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." [Citations omitted.]

*Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964). In the circumstances of this case, we conclude that the trial judge neither abused his discretion nor violated due process in requiring the trial to take place without Attorney Moore.

Robinson asserts that "the lower court removed present counsel without even a hearing on the matter to determine if such a drastic step was necessary." Contrary to this assertion, however, the trial court never removed Attorney Moore, who remained on record as counsel throughout. Rather, the record clearly suggests that Attorney Moore, by continually and continuously absenting himself from and making himself unavailable to both his client and the court, in effect removed himself. After the preliminary hearing, Attorney Moore was Robinson's counsel in name only. Yet despite the fact that Attorney Moore had apparently made no request for a continuance and presented no reasons for one,[14] the court only permitted the trial to take place with Attorney McHugh as defense counsel after a thorough, albeit fruitless, attempt to reach Attorney Moore and ascertain his whereabouts. As in *Commonwealth v. Merritt*, 227 Pa.Super. 257, 323 A.2d 875 (1974), another case involving Attorney Moore in which a prior continuance had already been granted, no indication had been given as to nate counsel, the trial court in the instant case properly when privately-retained counsel would be available, and the court had taken the precaution of appointing alter- found the alternative of continued delay unacceptable.

14. See Pa.R.Crim.P. 301 and note 10, supra.

The record clearly establishes that the trial court gave Robinson "a fair [and] reasonable opportunity to obtain particular counsel" and did not arbitrarily prohibit "the effective use of such counsel." *United States ex rel. Carey v. Rundle,* supra, 409 F.2d at 1215. Cf. *Commonwealth v. Atkins,* 233 Pa.Super. 202, 336 A.2d 368 (1975). Indeed, the trial court commendably went even further than this and, in order to assure Robinson his right to effective counsel, appointed Attorney McHugh well in advance of the trial in the event Robinson should prove unable to obtain the counsel of his choice. It is, of course, regrettable that Robinson neither took effective steps to assure the availability of counsel of his choice nor cooperated with his court-appointed counsel, but the record makes it plain that his conduct in this regard was both knowing and deliberate, though contrary to the clearly-expressed advice of the court. At no time did Robinson raise a specific objection to his court-appointed counsel; he merely continued unreasonably to insist on an absolute right to the lawyer he had paid. Cf. *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462 (1975). Nor does he now allege that his court-appointed counsel was in any way ineffective or inadequate, or that having the counsel of his choice would have in any way enabled him to present a stronger defense. Cf. *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940). To the contrary, the record demonstrates that he was given a spirited and thorough defense, subject only to the limitations deliberately imposed by Robinson himself. Accordingly, his final contention must be rejected.

Judgments of sentence affirmed.

NIX, J., filed a dissenting opinion.

MANDERINO, J., filed a dissenting opinion.

NIX, Justice (dissenting).

In my judgment the trial court abused its discretion in refusing to grant the requested continuance because of

the unavailability of privately retained counsel and thereby deprived appellant of his constitutionally protected right to counsel of his choice. For this reason I dissent.

Although I fully recognize that the right to counsel of one's choice is not an absolute right, see, *Moore v. Jamieson*, 451 Pa. 299, 306 A.2d 283 (1973),[1] I do not believe the record here provided a sufficient basis for concluding that appellant's right to counsel of his choice was required to give way to compelling state's interests.

In attempting to reach an accommodation between these considerations, we have set forth certain factors that should be considered:

In balancing these conflicting rights, four factors must be considered: (1) Whether the state interest sought to be achieved can be effectively accomplished in some manner which will not infringe upon interests protected by constitutional rights; (2) Whether the state interest is sufficiently compelling when compared with the interests affected, justifies any infringement of those interests; (3) Whether the state interest is sufficiently compelling to justify the degree of in-

---

1. In *Moore v. Jamieson*, 451 Pa. 299, 306 A.2d 283 (1973), quoting from the United States Court of Appeals for the Third Circuit in *United States ex rel. Carey v. Rundle*, 409 F.2d 1210, 1214–15 (1969), we observed:

"Desirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of criminal justice. The calendar control of modern criminal court dockets, especially in metropolitan communities is a sophisticated operation constantly buffeted by conflicting forces. The accused's rights—such as those relating to a speedy trial, to an adequate opportunity to prepare the defense, and to confront witnesses—are constantly in potential or real conflict with the prosecution's legitimate demands for some stability in the scheduling of cases. The availability of prosecution witnesses is often critically dependent on the predictability of the trial list. That delays and postponements only increase the reluctance of witnesses to appear in court, especially in criminal matters, is a phenomenon which scarcely needs elucidation." *Id.* at 309, 306 A.2d at 289.

fringement that is necessary to effectuate that interest; (4) Whether the provision under challenge represents the narrowest possible infringement consistent with effectuating the state interest involved. *Moore v. Jamieson,* supra at 310–11, 306 A.2d at 289.

It is apparent under these facts that the trial judge could understandably have been piqued because of the difficulty experienced in attempting to have counsel present and available for trial. This fact, however, alone does not justify the abrogation of a right as fundamental as the right of an accused to counsel of his choice. There is no evidence that a further delay that might have been occasioned by the requested continuance would have in any way prejudiced the Commonwealth's case. Further, the record fails to offer any grounds from which it could be determined that this delay would have had a significant impact upon the scheduling and the operation of the court's calendar.

It cannot be said that the state's interest was sufficiently compelling when compared with the right of the accused to justify the infringement of such a basic right. The situation was further exacerbated by the fact that the denial of privately retained counsel effectively deprived this defendant of meaningful representation at trial. By so concluding, I do not in any way intend to disparage the efforts expended on appellant's behalf by his court-appointed counsel. I only recognize, as does the majority, that appellant clearly did not avail himself of the advice and counsel supplied by the court-appointed attorney and thus faced serious charges without the benefit of legal-guidance.

Under all of these circumstances, I must conclude the effect of the refusal to grant the request for continuance denied Mr. Robinson his constitutional right to trial with counsel of his choice. A new trial should be awarded.

MANDERINO, Justice (dissenting).

I dissent because appellant was forced to trial without the representation of the attorney of his choice. The majority reasons that a person's constitutional right to be represented by counsel of his or her choice "must be weighed against and may be reasonably restricted by 'the state's interest in the swift and efficient administration of justice.'" The majority opinion fails to consider just what "the state's interest" in such a case really is.

The majority asserts that appellant does not have the absolute right to counsel of his choice when that choice unreasonably clogs "the machinery of justice." I fail to see how granting appellant's request for a continuance until his counsel of choice could be available for trial would have such an effect. Admittedly, the grant of a continuance, for whatever reason, makes more difficult the administration of the court calendar. If a person wishes to waive his or her right to a speedy trial until counsel of his choice is available to defend, the trial court should not refuse to grant a continuance unless the prosecution can establish that its case will be substantially prejudiced by the additional delay. The majority opinion *assumes* that the requested delay will prejudice the Commonwealth's case. Such an assumption should not form the basis for cutting off appellant's constitutional right to counsel of his choice. Only when the prosecution shows that its case will be prejudiced by the requested delay can the court "weigh" the state's interest against the defendant's right. Here the prosecution *has not alleged or proved* that its case would in any way be damaged by granting appellant's request for a continuance. I therefore dissent.