## Commonwealth v. Marker

*Joseph B. Policicchio,* for defendant.
*George B. Kaufman,* for the Commonwealth.
*Jerry L. Spangler,* for defendant's wife.

COFFROTH, *P.J.*, May 6, 1982—This is a petition filed by defendant for writ of habeas corpus to test whether there is sufficient evidence to establish a prima facie case of arson against him and to hold him for court on bail after preliminary hearing.[1] Two principal questions of law are raised: (1) Is the inquiry into the sufficiency of the evidence to establish a prima facie case confined to the evidence produced at the preliminary hearing, or is it a de novo hearing in which the Commonwealth may produce additional evidence to establish a prima facie case? (2) Is an out-of-court res gestae statement of defendant's wife inculpating him, testified to by a third party auditor, competent evidence of guilt under the statute governing the competency of spouses as witnesses against each other?

## HISTORY AND EVIDENCE

At the habeas corpus hearing, petitioner presented all of the witnesses and testimony which had been produced by the Commonwealth at the preliminary hearing before the district justice who returned the case to court and placed defendant on bail. That evidence sufficiently established that a fire at the home owned by defendant and his wife, and occupied by them and their small children, was probably of incendiary origin;[2] the evidence did not identify defendant or any other particular person as the actor in setting the fire.

After petitioner rested, the Commonwealth offered: (1) defendant's wife as a witness to establish (a)

that the prosecution was one for actual or threatened violence upon her or the minor children so as to render her a competent witness against her husband under the provisions of the statute and (b) that defendant was the actor who set the fire; and (2) a neighbor to establish that on the day of the fire defendant's wife came to his house, excited and apparently bruised, and told him that defendant set their home on fire and to call the fire department. Objections to the wife as witness both by counsel for petitioner and by counsel for the wife were overruled; the hearing Judge (the undersigned) ruled that the wife's testimony must first establish her competency under the statute before the court could consider any testimony from her adverse to defendant. Commonwealth counsel asked the wife what statements she had made at the time of and immediately after the fire to which she responded she did not recall because she had been "shook up" at the time. Commonwealth counsel then pleaded surprise and asked leave to cross-examine the wife as to her statements to the police by use of the police report, to which petitioner's counsel objected. The objection was sustained, whereupon the Commonwealth excused the wife without further interrogation. Then, the neighbor was permitted over petitioner's objection to testify to the wife's statement to him inculpating defendant as previously described.

## DISCUSSION

Habeas Corpus Hearing - Scope and Burden of Proof:

At the beginning of the hearing, each side waited for the other to proceed, each apparently assuming that the other had the burden of proof. We then assigned the burden to petitioner. Petitioner's counsel then announced that he conceived petitioner's burden

to be limited to presenting the evidence which had been produced before the district justice, citing our opinion in Com. ex rel Johnston v. Walker, 25 Somerset L.J. 70 (1970); we stated that the court was not then ruling on that question and that for the time being counsel should proceed as announced.

Johnston, supra, was also a habeas corpus proceeding brought to test whether there was a prima facie case against defendant, but we think petitioner misreads the case as respects the scope of hearing. There we said (75):

"In the habeas corpus proceeding on the issue of a prima facie case, the court must hear the testimony de novo rather than decide upon the basis of testimony at the preliminary hearing, and that is the established practice in Pennsylvania."

Petitioner apparently considers that a de novo hearing is held when the court hears from the witnesses the same evidence produced in the prior hearing, and only that evidence, without any right of a party to produce additional evidence on the issue. But that is not and never has been the meaning of a "de novo" hearing; in all of the numerous instances elsewhere in the law where de novo hearings are held, the hearing court has not merely an appellate or review function,[3] but also a right and duty of full judicial inquiry and decision.[4] In a de novo hearing, "the court is required to determine anew . . . . de novo review entails, as the term suggests, full consideration of the case another time. The court of common pleas, as the reviewing body, is in effect substituted for the . . . . prior decision maker, and re-decides the case."[5] The term de novo "means that a case shall be heard the same as though it had not been heard before."[6] No authority has been cited to us nor have we found any which limits the de novo hearing to the evidence produced

at the prior hearing. Such a restriction would also be inconsistent with the historical importance and purpose of the great "freedom writ"[7] "to inquire into the cause of detention of any person . . . "[8] "brought by or in behalf of any person restrained of his liberty within this Commonwealth under any pretense whatsoever."[9]

In Johnston supra, the present issue of the scope of the habeas corpus hearing was not raised, but the procedure followed there was consistent with our present conclusions. There, the hearing was not limited to the evidence produced at the preliminary hearing; that evidence consisted only of an ex parte affidavit of an accomplice who did not appear at the preliminary hearing (inadmissible hearsay); at the habeas corpus hearing we "directed the district attorney to produce" at a continued hearing the maker of the affidavit, but he was not produced because the district attorney had learned that he had claimed his privilege against self-incrimination and refused to testify; although the Commonwealth had been offered the opportunity to produce additional testimony to make a prima facie case, the Commonwealth instead stipulated that it had no such evidence other than the ex parte affidavit (id, 72-73).[10]

This brings us to the related question of burden of proof. The general rule is that in habeas corpus proceedings petitioner has the burden of affirmatively establishing the circumstances entitling him to relief, by evidence which is clear and convincing.[11] Nevertheless, where the issue in habeas corpus is whether there is a prima facie case in a criminal prosecution to hold petitioner in custody or on bail, the Commonwealth retains its original burden of establishing a prima facie case. Melding together those two principles, we conclude that in such case petitioner's only initial burden is to

establish that his liberty is restrained, whereupon the burden of showing a prima facie case shifts to the Commonwealth.[12] We erred in placing the full burden of proof on petitioner, but since he was not required to go beyond what he offered to prove, and since all additional evidence was produced by the Commonwealth, and since we now treat all witnesses as being Commonwealth witnesses, there is no harm or prejudice to defendant from the misallocation of the burden of proof.

At the habeas corpus hearing, it was conceded that petitioner was not in custody and was free on bail; it was also correctly agreed that being on bail is a restraint of liberty for habeas corpus purposes.[13]

Our conclusions on the scope of hearing and burden of proof are consistent with Johnston supra and other authorities generally.[14]

Admissibility of Extrajudicial Res Gestae Inculpatory Statement of Defendant's Wife:

From the evidence it is apparent that the existence of a prima facie case of arson against defendant depends upon admissibility of defendant's wife's out-of-court statement that defendant set their house on fire. Consequently, the parties differ on the question of admissibility; but they appear to accept the proposition decided by Johnston supra that a prima facie case in a criminal prosecution, in order to warrant its return to court and detention of defendant for that purpose, must rest on legally competent evidence and may not rest entirely on inadmissible hearsay.[15]

In the instant case, the wife's out-of-court statement testified to by the third party auditor was not inadmissible hearsay; the evidence produced demonstrates that it was an excited or res gestae utterance within the exception to the hearsay rule.[16] The question then became whether the evidence was

incompetent as testimony by wife against husband under our statute which provides as follows:

"§5913. Spouses as witnesses against each other

"Except as otherwise provided in this subchapter, in a criminal proceeding husband and wife shall not be competent or permitted to testify against each other, except that in proceedings for desertion and maintenance, and in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them, each shall be a competent witness against the other, and except also that either of them shall be competent merely to prove the fact of marriage, in support of a criminal charge of bigamy alleged to have been committed by or with the other."[17]

In calling the wife as witness, the Commonwealth contended that her testimony would come within the statutory exception for injury or violence attempted, done or threatened upon her or minor children in her care or custody, but was unable to establish that the crime charged (arson) was of that character.[18] Hence we must assume the wife's incompetence to testify from the stand against her husband. The question then becomes whether, by admission of the third party testimony to her inculpatory extrajudicial statement against her husband, the wife was "permitted to testify" within the meaning of and in violation of the statute. The common and approved legal meaning of the word "testify" is:

"To make a solemn declaration under oath or

affirmation, for establishing proof of some fact to a court."[19]

"The word 'testify' ordinarily means the making of any statement under oath in a judicial proceeding."[20]

"The word 'testify' means to give testimony under oath as a witness, to affirm or declare under oath or affirmation before a tribunal to prove some fact."[21]

One who testifies gives "testimony," which is not the equivalent of "evidence," a much broader term, absent language in the statute manifesting an intention to equate them.[22] There is no language in our statute suggesting the broader meaning or giving any special or technical meaning; accordingly, the statutory mandate that "unless . . . . inconsistent with the manifest intention of the General Assembly," "words and phrases shall be construed according to . . . . their common and approved usage," should be applied.[23] Doing so leads to the conclusion that admission into evidence through the third party witness of the wife's unsworn extrajudicial statement did not constitute permitting her "to testify" within the meaning of the statute, and such evidence (otherwise admissible, under the hearsay rule) is not affected by her statutory incompetence to testify against her husband in this criminal proceeding.[24]

Nevertheless, if the revelation by defendant's spouse to a third person of information adverse to defendant is deliberate, and the information is produced in court through the third person's testimony, admission of the testimony may merely be accomplishing indirectly what cannot be done directly through the spouse and may be an impermissible evasion of the statute.[25] Thus a wife's act in delivering to the authorities for use as evidence

against her husband letters written by him to her, "in effect was permitting the wife to testify against her husband."[26] It has been held, however, that the statute does not forbid admission of evidence learned by competent witnesses from sources other than defendant's spouse as the result of having been put on the track of it through information furnished by the spouse.[27]

But the prevailing rule is that res gestae (excited utterance) declarations are admissible in evidence through the testimony of a competent third party auditor even though the declarations were made by an incompetent witness.[28] The circumstances making them admissible not only vouch for their reliability, but also negative deliberate evasion of the incompetency statute. The exception applies to incompetency as between husband and wife.[29] The res gestae exception to interspousal incompetency has been recognized in Pennsylvania both at common law before enactment of our statute, and since its enactment.[30] The common law is stated in Gilchrist v. Bale, supra n. [30] as follows:

"It is a general rule that the declarations of a husband or wife cannot be received in evidence against each other, either civilly or criminally. But this rule cannot be extended to all possible cases: for where no confidence has been violated, the law had admitted of some exception . . . . [The Court has] allowed what the wife said immediately upon the injury received, and before she had time to devise anything for her own advantage [or her husband's disadvantage], to be given in evidence as part of the res gestae." Bracketed words added.

Accordingly, whether admission into evidence of a third person's testimony of an extrajudicial declaration of defendant's spouse constitutes permit-

ting the spouse "to testify" within the meaning of our statute depends upon the context of circumstances and issues presented and the public policies involved. Broader statements in some authorities characterizing extrajudicial statements as testimony[31] must be read with caution and in the context of the facts of particular cases. Thus, in Kerr v. Clements, 148 Pa. Super. 378 (1942), involving §5(c) of the Act of 1887 P.L. 158 (now Judicial Code §5924) dealing with spousal competence "to testify" against each other in civil cases, the Court said (383):

"What is prohibited by the act is testimony in any form by the wife or husband against the other. Extrajudicial admissions are a sort of testimony; hence the prohibition of the act applies to them with the same force as though made by a spouse from the stand. Wigmore, Evidence, 3d Edition, 2232."[32]

In that case, both husband and wife were defendants and apart from spousal competency the wife's adverse testimony would have been admissible as a party's extrajudicial admission; the evidence was held admissible on policy grounds, and res gestae was not involved. The above language of Kerr was quoted in Com. v. Garrison, supra n. [27], 51; that was a prosecution of the husband for a crime for which the wife had already been convicted as an accessory. In the husband's trial, the Commonwealth produced evidence from a third person of statements made by the wife to the witness as part of the conspiracy, admissible under the hearsay rule. The court held the evidence admissible, saying that the wife "did not testify, and we do not ascribe the evidence to her as being the equivalent of testimony. It was not against her husband and did

not refer to him . . . "[33] Kerr is also cited with approval in Com. v. Wilkes, supra n. [26], 251, but res gestae declarations were not involved. It is the general rule elsewhere that statutes making spouses incompetent as witnesses against each other do not apply to the extrajudicial res gestae declarations of one spouse against the other testified to by a third person auditor.[34]

Finally, there are grounds of public policy supporting the res gestae exception in interspousal incompetency cases. "The prohibition against the giving of testimony by one married party against the other, is based upon consideration for preserving domestic peace, harmony and the sanctity of marriage." Com. v. Wilkes, supra, 251. The theory is that preservation of marital harmony is good not only for the accused's family but for society.[35] This prohibition and the theory underlying it are today considered to be indefensible anachronisms.[36] As shown by Wigmore (§2228, pages 216-218), there are only two reasons for the policy worthy of discussion: (a) the danger of causing dissension between spouses and disturbing the peace of their family, and (b) the natural repugnance to compelling one spouse to be the means of the other's condemnation; but "the peace of families does not essentially depend on this immunity" (page 216), and the repugnance felt at arraying spouse against spouse is merely "the sentiment of sportsmanship" (page 217).[37] As of 1970, 22 states had abolished the rule of interspousal incompetency entirely, except for their confidential communications.[38] We still have the prohibitory statute in Pennsylvania, which represents the public policy we must adhere to, but we need not and should not extend it beyond the clear necessities of the statutory language in order to reach extrajudicial statements, absent evasive tactics.[39] Res gestae

statements lack that deliberate quality. Moreover, as respects family harmony, third party evidence of a spouse's spontaneous excited on-the-spot utterance is not nearly as offensive or disturbing to domestic peace as is confronting the spouse on trial with the other spouse's direct testimony from the stand which was the original target of the prohibition. As stated by Wigmore (§2227, page 212):

"Possibly the true explanation is, after all, the simplest one, namely, that a natural and strong repugnance was felt (especially in those days of closer family unity and more rigid paternal authority) to condemning a man by *admitting to the witness stand* against him those who lived under his roof, shared the secrets of his domestic life, depended on him for sustenance and were almost numbered among his chattels." (Emphasis added.)

Without detracting from the importance of family unity, today any unity between spouses worth preserving must rest on a sounder and substantially different foundation than that outlined above by Wigmore; it must be founded on the mutual "trust they place in the loyalty and discretion of each other"[40], and upon a mutual recognition of equality and autonomy in their relationship. The harmony arising from such a relationship will not likely be seriously threatened by third party res gestae evidence. Also without such harmony in fact the law's policy is ineffective and inapplicable.[40a] Thus, the policies of interspousal incompetency do not really benefit society at all, but only the party or parties who benefit from nondisclosure of relevant evidence.

Thus, the most important factor in evaluating the policy of preserving family harmony, in the context

of interspousal witness immunity, is the fact that doing so suppresses needed truth, and in cases of criminal prosecution sacrifices criminal justice. Even assuming that family harmony is somehow promoted by the rules of interspousal witness incompetency, the question is: At what price?

"Let us, therefore, grant to every man a license, in the presence and with the assistance of his wife: let us secure to every man in the bosom of his family, and in his own bosom, a safe accomplice: let us make every man's house his castle; and, as far as depends on us, let us convert that castle into a den of thieves."[41]

Insofar as interspousal incompetency may contribute to family harmony, "that result is not to be allowed to stand in the way of doing justice to others."[42]

"Let us face the fact that when a party appears in a court of justice, charged with wrong or crime, the unavoidable and solemn business of the court is to find out whether he has been guilty of the wrong or the crime; that the state and the complainant have a right to the truth; and that this high and solemn duty of doing justice and of establishing the truth is not to be obstructed by considerations of sentiment, in this respect any more than in others."[43]

Professor McCormick expresses a similar view as follows:

"The attitude of the courts in these cases seems in effect a reaching back toward the old common law principle of preserving family harmony by disqualifying a spouse from testifying for or against the other. A different attitude it is believed would be wiser, namely, that of accepting the view that all privileges, in general, and this privilege for marital

confidence in particular, are inept and clumsy devices to promote the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. Accordingly, the movement should be toward restriction, and not toward expansion, of these mechanisms for concealment of relevant facts." Second Edition, § 79, page 165.

In a well considered recent opinion, US v. Tsinnijinnie, supra n. [34], holds that evidence from a competent third party auditor of a spouse's res gestae statement against the other spouse is not barred by spousal incompetency. The court there concluded (1039):

"We agree that the marital privilege should not be extended to bar a witness from relating an excited utterance by a spouse. The possible benefits that would derive from such an extension cannot justify excluding the evidence which is relevant and often highly probative. Experience demonstrates that the potential benefits of the marital privilege are often more imaginary than real; when a marriage has deteriorated to the point where one spouse makes statements damaging to the other, that marriage will usually proceed to its fate regardless of how the spousal privilege is applied."[44]

This opinion is written in support of our order of May 3, 1982, denying defendant's petition for habeas corpus relief.

---

1. Defendant's application is entitled: "Petition For Writ Of Habeas Corpus/Application To Quash Return Of Issuing Authority." As to the proper method of challenging existence of a prima facie case, see: Com. v. Loar, 264 Pa. Super. 398, 407 note 3, 399 A. 2d 1110 (1979); Com. v. Hess, 489 Pa. 580 (1980); compare Com. v. Duvall, 101 Criminal 1981.

2. The evidence before the district justice was sufficient to establish the corpus delicti. See: Com. v. Panasci, 26 Somerset L. J. 216 (1971), Com. v. Stull, 34 Somerset L. J. 359 (1977), and Com. v. Tallon, 478 Pa. 468, 476, 387 A. 2d 77, (1978).

3. Compare Com. ex rel Burton v. Baldi, 147 Pa. Super. 193, 201, 24 A. 2d 76, (1942).

4. A "judicial inquiry . . . . involves, ordinarily, a hearing and all that is thereby implied." Seabord Surety Company v. Com., 345 Pa. 147, 153 ___ A. 2d ___, (1942).

5. Civitello v. Com., 11 Pa. Commw. 551, 553, 315 A. 2d 666, (1974).

6. 25A CJS, De page 483 at note 38.10.

7. P.L.E., Habeas Corpus § 1.

8. Judicial Code § 6502(a).

9. Judicial Code § 6503(a).

10. The relevant statute under which Johnston was decided was the Act of 1937 P.L. 2664, §2, 12 P.S. § 1893, which provides as follows:

"Such examination into the facts of the case shall include an examination by the Judge into all the proceedings held and *evidence produced before a judge, magistrate, justice of the peace, or other officer sitting as a committing judge or magistrate,* and if such proceedings shall, after inquiry, be deemed to have been conducted not in accordance with law, or the *evidence* deemed insufficient, the prisoner shall be discharged." (Emphasis added.)

Obviously, in Johnston we construed the second emphasized phrase ("the evidence") as meaning the evidence produced at the habeas corpus hearing, and not merely as referring back to the first emphasized phrase ("evidence produced before . . . [the] justice of the peace").

The 1937 Act is "essentially a statement of the court's ancient common law powers" in habeas corpus. Johnston, supra, 74; Com. ex rel Levine v. Fair, 394 Pa. 262, 278 146 A. 2d 834, (1958). "Even without the Act of 1937, a judge would have the right to inquire into the facts which caused the detention of the petitioner." Levine, supra, 267. The 1937 Act has been repealed and supplanted by Judicial Code, Chapter 65, which eliminates the language of §2 of the 1937 Act quoted above and contains no language pertaining specifically to preliminary hearing cases.

11. P.L.E., Habeas Corpus § 31 at notes 7-9.

12. CJS, Habeas Corpus § 194.

13. Com. v. Hess, supra, note [1]; Com. ex rel Paulinski v. Isaac, 483 Pa. 467, 397 A. 2d 760, (1979); see also Com. v. Orman, 268 Pa. Super. 383, 408 A. 2d 518, (1979), petitioner on probation or parole.

14. See: P.L.E., Habeas Corpus §30 at notes 93 and 94; Com. ex rel Levine v. Fair, supra, Com. ex rel Scolio v. Hess, 149 Pa. Super. 371, 27 A. 2d 705, (1942); Com. ex rel Lund v. Sheriff of Crawford County, 17 D. & C. 343 (1931); compare Com. v. Lynch, 270 Pa. Superior 554, 561, 411 A. 2d 1224, (1979).

15. Accord: Com. v. Mitchell, 30 Somerset L.J. 340, 345, 73 D. & C. 2d 472, 478 (1975). See also Lehrer and Lewis, The Preliminary Hearing In Pennsylvania, XLIX Pennsylvania Bar Association Quarterly 500 (1978); CJS, Criminal Law §345a note 14; compare Bleilevens v. Com., 11 Pa. Commw. 1, 312 A. 2d 109, (1973), administrative hearings.

Subsequent appellate decisions have established two exceptions to the rule that evidence at the preliminary hearing must be legally competent: (1) documentary hearsay evidence is admissible provided that there is a reasonable expectation that the declarant or other proper witness will appear at trial, Com. v. Loar, supra, 408-409, Com. v. Noyer, 265 Pa. Super. 544, 557 (1979) and Com. v. Rick, 244 Pa. Super. 33 (1976); and (2) prior inconsistent statements are admissible at preliminary hearing not only to impeach but as substantive evidence, Com. v. Loar, supra, 410-413, compare Com. v. Burton, supra. Loar, supra, also declares by dictum that prior inconsistent statements may be received as substantive evidence at the trial. See also Com. v. Strube, 13 D. & C. 3d 511 (1979). On constitutional requirements, see Gerstein v. Pugh, 420 U.S. 103, 43 L. E. 2d 54, 69 (1975).

In the instant case, a ruling at the habeas corpus hearing denying Commonwealth counsel the right to use the prior statement of defendant's wife, called as Commonwealth's witness, on a plea of surprise, was based on the fact that the statement did not really contradict the witness because she testified only that she could not remember what she had previously said. See: Com. v. Moore, 462 Pa. 231, 235 (1975); Com. v. Bynum, 454 Pa. 9 (1973); Com. v. Tucker, 452 Pa. 584, 589 (1973); Com. v. Morris, 273 Pa. Super. 477, 481, 417 A. 2d 748 (1979); Com. v. Brown, 250 Pa. Super. 504 (1977), injurious testimony v. failure to support case. Moreover it was extremely doubtful that Commonwealth counsel was "really surprised"

by the wife's testimony or that it was unexpected. See Com. v. Brown, supra, 515; compare Com. v. Kinnard, 230 Pa. Super. 134, 141, 326 A. 2d 541, (1974) and Com. v. Filer, 249 Pa. Super. 349, 353, 378 A. 2d 330, (1977) on nature of surprise required. Had Commonwealth counsel asked leave to allow the witness to read the prior statement to herself merely to determine whether it refreshed her recollection, that should have been allowed. See: Feldman, Pennsylvania Trial Guide §6.23; P.L.E., Witnesses §122; Com. v. Moore, supra, 234.

16. See: Com. v. Hugney, 491 Pa. 222 (1980); Com. v. Parson, 485 Pa. 240, 401 A. 2d 749, (1979); Com. v. Shepherd, 269 Pa. Super. 291, 409 A. 2d 894, (1979); Com. v. Summers, 269 Pa. Super. 437, 410 A. 2d 336, (1979); Com. v. McIntosh, 258 Pa. Super. 101, 392 A. 2d 704, (1978); Binder, The Hearsay Handbook (McGraw-Hill, 1975) Exception 2.

17. Judicial Code §5913, formerly §2(b) of the Act of 1887 P.L. 158, 19 P.S. §683.

18. On arson as a crime of violence, see: Com. v. Whaley, 40 Somerset L.J. 43, 45 (1980); C.J.S., Witnesses §101 page 506.

Although we allowed the Commonwealth to call the wife as a witness at the habeas corpus hearing to determine initially only whether her testimony might fall within the statutory exception to interspousal incompetency, the effort failed because she testified merely that she could not remember. So we need not decide here whether a spouse is competent to testify to facts which would bring her or him within the statutory exception. In Com. v. Robinson, 468 Pa. 575, 364 A. 2d 665, (1976), the court says, after quoting the statute and emphasizing the exceptions, that: "It is conceded that the quoted exception contained in the statute made the wife competent to testify to Robinson's alleged acts of violence directed against her" (585-586); the same notion is repeated later in the opinion (585). But the Court further said in footnote 6 that: "We note also that her testimony about these actions was corroborated at trial by other eyewitnesses and was otherwise uncontroverted." Compare: Com. v. Galloway, 271 Pa. Super. 305, 307, 413 A. 2d 418, (1979); Com. v. Barksdale, 219 Pa. Super. 444, 448, 281 A. 2d 703, (1971); Haas v. Fitzpatrick, 117 Pa. Super. 21, 25, 177 A. 326, (1935).

19. Webster's New Collegiate Dictionary (Second Edition, Merriam, 1960).

20. 86 C.J.S., Testify page 650 at note 33.

21. Gardner v. Ward, 199 N.Y.S. 2d 953, 956 (19 ).

22. See Com. ex rel Hendrickson v. Myers, 393 Pa. 224, 228, 144 A. 2d 367, (1958); 86 C.J.S., Testimony.

23. See: 1 Pa. C.S.A. §§1901 and 1903(a).

24. See also Wigmore On Evidence (Third Edition [McNaughton] 1961) §2227 page 212 discussed and quoted in the opinion at page 12.

25. See: C.J.S., Witnesses §86 (Indirect Testimony).

26. Com. v. Fisher, 221 Pa. 538, 544, 70 A. 2d 865, (1908); compare: Com. v. Bishop, 285 Pa. 49 (1926), Com. v. Wilkes, 414 Pa. 246, 199 A. 2d 411, (1964) and Com. ex rel Cabey v. Rundle, 432 Pa. 466, 475, 248 A. 2d 197, (1968).

27. Com. v. Garrison, 398 Pa. 47, 157 A. 2d 75, (1959); Welker v. New York Central Railroad, 275 Pa. 82, 118 A. 2d 615, (1922); compare Com. v. Umberger (No. 3), 35 Somerset L.J. 284, 295 (1976) and Com. v. Winter, 289 Pa. 284, 292, 137 Atl. 261, (1927).

28. Summary of Pennsylvania Jurisprudence, Evidence, §164; C.J.S., Criminal Law §662(7); C.J.S., Evidence §410a page 992; C.J. Evidence §171b; Wharton's Criminal Evidence (Lawyers Co-op, 12th Edition 1955) §283.

29. See: C.J.S., Witnesses §86 page 486; Wharton's Criminal Evidence supra §§283 and 773; Wigmore, supra, §2232 at note 7, 1981 Supplement.

30. At common law in Gilchrist v. Bale, 8 Watts 355, 357 (1839); under the statute, see: Com. v. Robinson, supra, 586; Com. v. Hess, 270 Pa. Super. 501, 411 A. 2d 830, (1979); Com. v. Smith, 83 York 39, 40 (1969). See also Summary of Pennsylvania Jurisprudence, Evidence §164.

31. See: P.L.E., Witnesses §41 note 6; Summary of Pennsylvania Jurisprudence, Evidence §474 page 469.

32. Wigmore, who makes a devastating attack upon the rationality of interspousal incompetency (except as respects their confidential communications) in §2228 says of the extension of the principle to extrajudicial utterances merely that: "It can be argued that such hearsay statements are testimonial utterances" (§2232). But in the 1981 supplement to §2232, a new note 7 is added stating: "Spontaneous statement of wife is admissible."

33. In Garrison, the court also said that the husband's testimony against the wife given from the stand in his trial was harmless to the wife because she had already been convicted (52).

34. See: State v. Breyer, 232 P 560 (1925); U.S. v. Tsinni-

jinnie, 601 F2d 1035 (Ca9 1979); Bradford v. State, 54 SW2d 516 (Texas 1932); and other authorities cited at note [28] supra.

35. See Com. ex rel Platt v. Platt, 266 Pa. Super. 276, 282, 404 A. 2d 410, (1979).

36. See: Wigmore, supra, §§2227-2228; McCormick On Evidence (West, 2nd Edition, 1972) §66.

37. See also McCormick, supra, §66 page 173.

38. 74 Dickinson Law Review at 502.

39. See McCormick, supra, §79 page 165.

40. See: McCormick, supra §86 page 173; Com. v. Galloway, supra, note [18], 312; Kine v. Forman, 205 Pa. Super. 305, 309, 209 A. 2d 1, (1965); compare Hack v. Hack, 495 Pa. 300 433 A. 2d 859, (1981) abolishing interspousal immunity to suit.

40a See: Com. v. Wilkes, supra, 251 as commented on in Com. ex rel Cabey v. Rundle, supra, 475.

41. Wigmore, supra, §2228 page 218, quoting Bentham. See also Com. v. Moore, 453 Pa. 302, 316,309 A. 2d 569, note 11 (1973), dissenting opinion.

42. Wigmore, supra, §2228 page 216.

43. Wigmore, supra §2228 pages 217-218. Compare: Com. v. Berkey, 39 Somerset L.J. 101, 107 (1979) and Com. v. Yoder, 27 Somerset L.J. 155, 158 (1972).

See also Com. v. Clanton, 395 Pa. 521, 527, 151 A. 2d 88, (1959), where the court said: "The Act [governing interspousal immunity] was intended to make competency the rule and incompetency the exception, and a narrow construction of the Act would often result in suppressing truth."

44. Accord: Davidson v. State, 386 SW2d 144 (Texas 1965); Eubanks v. State, 135 So 2d 183 (Miss. 1961).