J. S12038/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| NASUIL MARTINEZ, | : | |
| | : | |
| Appellant | : | No. 1680 EDA 2014 |

Appeal from the Judgment of Sentence February 28, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0002804-2011
CP-51-CR-0002773-2011
CP-51-CR-0002774-2011
CP-51-CR-0002775-2011
CP-51-CR-0011128-2011

BEFORE: BOWES, SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MARCH 09, 2015**

Appellant, Nasuil Martinez, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following a waiver trial and his convictions for one count of first-degree murder,[1] four counts of attempted murder,[2] four counts of aggravated assault of a protected class

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502.

[2] 18 Pa.C.S. § 901.

member,[3] four counts of assault of a law enforcement officer,[4] one count of theft of a handgun,[5] one count of robbery,[6] and one count of possessing an instrument of crime.[7]   Appellant contends the evidence was insufficient to convict him of murder where the conviction was based upon his possession of the murder weapon before and after the homicide.  We affirm.

The trial court summarized the facts and procedural history of this case as follows:

> On December 9, 2010, [Appellant] was present at the Black Pumpkin, a bar on Whitaker Avenue and Wyoming Avenue in Philadelphia.  Frank Parran was on duty providing security.  Parran was armed with a .45 caliber pistol, which was housed in a holster with a faulty closing mechanism.  As a part of his duties, Parran searched individuals entering and leaving the bar, including [Appellant], who frequently entered and left the bar that evening.  At approximately 2:45 a.m. on December 10, 2010, Parran noticed that his firearm was missing from its holster, having last checked to confirm that the firearm was in his possession at approximately 2:00 a.m.  Parran reviewed the security footage taken by a surveillance camera located within the bar and noticed that [Appellant] was the only individual in his vicinity at the time that he believed his firearm had been taken.  Later that day, Parran identified [Appellant] in a photo array.

---

[3] 18 Pa.C.S. § 2702.

[4] 18 Pa.C.S. § 2702.1.

[5] 18 Pa.C.S. § 3921.

[6] 18 Pa.C.S. § 3701.

[7] 18 Pa.C.S. § 907.

In the early morning hours of December 10, 2010, sometime before 3:00 a.m., Officer Kevin [Gorman] and his partner were on patrol, driving eastbound on Allegheny Street, when they noticed a silver Grand Marquis traveling towards them at an extremely high rate of speed. The officers initiated a traffic stop at Hope Street and Westmoreland Street. Upon Officer Gorman exiting the police vehicle, [Appellant], seated in the back passenger side seat of the Grand Marquis, exited the vehicle and ran northbound up Hope Street and Gorman pursued. [Appellant] then scaled a chain-link fence on the side of the street, turned, and shot twice at Gorman with a black handgun, striking him once in the left shoulder. Officer Gorman lost sight of [Appellant] at this time. The bullet that struck Gorman was recovered in the sleeve of his shirt, while two fired cartridge cases were later recovered by the Crime Scene Unit. The remaining occupants of the Grand Marquis, Miguel Montalvo, Neftaly Aulet, and Hector Ortiz, were transported to the Philadelphia Police Station at 8th and Race Street. Montalvo and Aulet both identified [Appellant] in a photo array. Later in the afternoon of the same day, Gorman identified [Appellant] in a photo array as the individual who had shot him.

At some point in mid-December, [Appellant] began staying in the basement apartment of Tillie Moless on Sanger Street in Philadelphia. This apartment had an entrance separate from the rest of the building, where individuals could enter and exit without entering any common area of the residence. While staying with Moless, [Appellant] constantly had a firearm in his possession, either on his belt or in his hand. When Moless asked [him] why he seemed nervous all the time, [Appellant] showed her a TV news segment, indicating that he was wanted for Gorman's shooting.

At approximately 2:00 a.m. on December 21, 2010, the decedent, Carlos Fernandez, was returning home from a night at the Sugar House Casino in Philadelphia. Jeanette Bobe, Fernandez's wife, briefly met with him in the downstairs portion of the house before returning upstairs to return to bed. Shortly thereafter, Bobe heard multiple gunshots coming from the first floor of her home. Bobe went into the hallway in order to gather her two children

and saw Fernandez lying on the floor. Bobe then locked herself and her children in her room and dialed 911, informing the police that her husband was shot and that someone was in the house. While talking with the police, Bobe heard a male voice through her bedroom door, telling her to give him all the money in the house and that he would leave them alone. Subsequent investigation revealed that **Fernandez had been shot a total of three times in the chest**, and one grazing shot to his arm. Two bullets were recovered from the body.

**Surveillance video footage from the casino showed Fernandez wearing a distinctive set of earrings and a watch on the night he was murdered.** According to Bobe, Fernandez was wearing the earrings and watch when he returned home from the casino. **Police did not find any earrings or watch on Fernandez following the murder.**

Approximately three months before Fernandez's murder, September 27, 2010, [Appellant] and Fernandez had been involved in an incident arising out of Fernandez's loaning of money to [Appellant's] sister, Littles. Fernandez had loaned Littles $300, keeping Littles' car as collateral. A friend of Littles, Darnella,[8] sought the return of the vehicle without payment on the debt and the situation spiraled into an argument. [Appellant] paid Fernandez the $300 in order to "drop the confrontation," while Darnella yelled that she was "going to get someone to shoot [Fernandez] or kill him, or whatever." Fernandez responded that he could "get guns" if needed, while [Appellant] stated that he had already been shot before, showing a scar.

On December 22, 2010, police received information that [Appellant] might be located at Moless's Sanger Street residence. SWAT officers arrived at the house at approximately 4:15 in the morning, together with police from the 2nd District. Police subsequently entered the home, searching for [Appellant]. Sergeant [Christopher] Binns, together with Officers [Michael] Mocharnuk and

---

[8] Our review of the record did not reveal her last name.

[Francis] Whalen, descended into the basement, announcing their presence. All three officers were equipped with protective tactical gear, including body armor and a Kevlar helmet. Upon entering the basement the officers found a closed door and wall, separating the basement into two halves. Sergeant Binns opened the door, while Officer Mocharnuk searched the room beyond. Officer Whalen remained behind the wall separating the rooms. Immediately upon entering the room, Officer Mocharnuk located and recognized [Appellant], who was standing behind a bed towards the back wall.

Officer Mocharnuk ordered [Appellant] to show his hands and informed Sergeant Binns that he had located [him], whereupon [Appellant] disappeared from view. Immediately upon losing sight of [Appellant], approximately five to eight gunshots were fired from the location where [Appellant] was last seen. Officer Mocharnuk was not hit by the gunfire. Sergeant Binns was struck in the left temple-area on his helmet during the initial volley. The force of the bullet strike knocked Binns into Mocharnuk, who heard the distinctive sound of the bullet striking the helmet. Officer Whalen was struck in the direct center of his vest, where a ceramic trauma plate provided additional protection, by a bullet that punctured the interior wall separating him from the room where [Appellant] was located. The three officers returned fire and retreated up the staircase to the main floor of the building. [Appellant] fired a second volley of shots while the officers were retreating.

Upon the officers[,] retreat, [Appellant] stated, "Come on down, I got clips for days." [Appellant] further stated that he had a female hostage in the basement and that he had booby-trapped the basement door with a grenade. Officer [Inocencio] Amaro entered into negotiations with [Appellant], centered largely on providing [Appellant] with a cell phone. After approximately two hours, officers heard a single gunshot from the basement. [Appellant] then stated "Oh, shit, the gun went off" and requested assistance. [Appellant] was bleeding from a wound in the neck/shoulder area and was unconscious at the base of the stairs when officers re-entered the basement, taking [Appellant] into custody and providing medical assistance.

Recovered from the basement were twenty-three individual pieces of ballistic evidence and the pistol stolen from Parran two weeks earlier.

**[Appellant] was subsequently treated at Temple University Hospital, which took custody of [his] personal items upon his admittance, namely two earrings and a watch**, and gave these items to [Appellant's] mother. Detective [Kenneth] Rossiter obtained a warrant and seized the two earrings and a watch repair slip at [Appellant's] mother's home on April 28, 2011, while the watch itself was recovered the next day from the repair shop. Detective Rossiter then asked the victim's wife, Bobe, if she could identify the earrings and watch as belonging to her late husband. **Bobe identified the jewelry, stating that she had no doubt that the jewelry was owned by Fernandez.** In May, 2011, Tillie Moless, owner of the apartment where [Appellant] was found, recovered a camera that had been recording video during a forty-seven minute section of the stand-off between [Appellant] and the police. **In the video, [Appellant] could be clearly seen in possession of a semi-automatic firearm and wearing the jewelry that would be recovered by the hospital following the conclusion of the stand-off.**

Trial Ct. Op., 8/13/14, at 2-7 (footnote and citations omitted).

At trial, Officer William Trenwith testified, *inter alia*, as follows: he had been assigned to the Crime Scene Unit for 21 years. N.T., 11/5/13, at 37-38. Fernandez did not have a watch or earrings on when he conducted his investigation on the night of the murder. *Id.* at 47-48. He collected "three fired cartridge cases .45 caliber" from the premises.

Dr. Gary Collins, deputy chief of the Medical Examiner's Office, testified at trial. *Id.* at 90. The entrance of the first gunshot wound he described was located on the right side of the chest. *Id.* at 94. "**The**

**wound went through the chest from front to back and slightly from the right side to the left side and it went through the heart and the left lung** and existed on the left side of his back." *Id.* at 95. Another gunshot wound went through the soft tissue of Fernandez's chest, through the "**right lung, esophagus, left lung**, and a bullet was recovered somewhere in the soft tissues of the armpit on the left side." *Id.* at 96. The third gunshot wound was lower than the second gunshot wound. *Id.* The fourth gunshot wound was a graze wound, "located on the inner aspect of the arm." *Id.* at 97.

Officer Gregory Welsh, "an expert in the field of firearms identification and tool mark analysis[,]" testified at trial. *Id.* at 204. He "perform[ed] ballistic analysis with respect to several fired cartridge casings ["FCC"] as well as a .45 handgun related to [the] homicide and shootings of police officers[.]" *Id.* at 205. He testified regarding the three separate incidents. *Id.* at 207. **The FCC's from Officer Gorman's shooting on Hope Street and the SWAT team shootings on Sanger Street were determined to have been fired from the same gun**. *Id.* at 222. **The FCC's from the homicide scene were fired from the same gun**. *Id.* at 225-26. Welsh responded in the affirmative when asked: "Were the findings that you made with respect to matching up the fired cartridge casings from all three scenes done so within a reasonable degree of scientific certainty?" *Id.* at 227.

Appellant was convicted following a three day non-jury trial. On February 28, 2014, he was sentenced to an aggregate sentence of life plus 80 to 160 years' imprisonment. Post-sentence motions were filed and denied. This timely appeal followed. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal.[9] The trial court filed a responsive opinion.

Appellant raises the following issue for our review:[10] "Was not the evidence insufficient to sustain [A]ppellant's conviction of murder where the conviction was based upon [A]ppellalnt's possession of the murder weapon before and after the homicide?" Appellant's Brief at 2.

---

[9] Appellant filed a Rule 1925(b) statement. He then filed a request for an extension of time to file a Rule 1925(b) statement upon receipt of all of the notes of testimony. The court entered an order on June 30, 2014, granting the request for an extension of time. Appellant filed a supplemental 1925(b) statement on July 7, 2014. *See* Pa.R.A.P. 1925(b)(2) ("Upon application of the appellant and for good cause shown, the judge may . . . permit an amended or supplemental Statement to be filed. Good cause includes, but is not limited to, delay in the production of a transcript necessary to develop the Statement . . . .").

[10] We note that Appellant raised an additional issue in his supplemental Rule 1925(b) statement. He stated: "The sentences imposed consecutively to life without parole were unreasonably excessive." This issue was not raised in Appellant's brief on appeal and is therefore waived. *See Commonwealth v. Jones*, 815 A.2d 598, 604 n.3 (Pa. 2002) ("issue included in appellant's 'Statement of Questions Involved' was waived by failure to address issue in brief itself").

Appellant contends the evidence was insufficient to convict him of murder of the first degree.[11] He avers "[t]he conviction for murder . . . rested on **circumstantial evidence** that [A]ppellant was in possession of the murder weapon both eleven days before the killing and more than a day after the killing and [A]ppellant's possession of jewelry similar in appearance to (and identified as) that having belonged to decedent." *Id.* at 11 (emphasis added). He avers "[t]here was no evidence that [A]ppellant had any animosity toward the decedent." *Id.* at 12. Appellant claims

---

[11] Initially, however, we note that Appellant's argument consists of two and one-third pages in support of his insufficiency of the evidence claim. He cites the elements of first degree murder with reference to the statute. He cites one case without setting forth the principle for which it is cited. *See* Pa.R.A.P. 29119(b). Appellant's Brief at 11-13. This court has stated:

> Pursuant to the Pennsylvania Rules of Appellate Procedure, failure to cite to relevant authority provides a basis for us to find waiver. *See* Pa.R.A.P. 2119; *Commonwealth v. Einhorn*, 911 A.2d 960, 970 (Pa. Super. 2006) (holding that appellant's failure to properly develop claims in brief rendered the claims waived); *Commonwealth v. Drake*, [ ] 681 A.2d 1357, 1360 ([Pa. Super.] 1996) (explaining that this Court will not become the counsel for an appellant, "and will not, therefore, consider issues . . . which are not fully developed in [the] brief[ ]") (citation omitted). Nevertheless, considering that the trial court addressed [the a]ppellant's [. . .] claim in its well-reasoned Rule 1925 opinion, we consider the merits of [the a]ppellant's claim.

*Commonwealth v. Bowen*, 55 A.3d 1254, 1263 n.3 (Pa. Super. 2012), *appeal denied*, 64 A.3d 630 (Pa. 2013). Similarly, in the instant case, because the trial court addressed Appellant's claim in its well-reasoned Rule 1925(a) opinion, we will consider the merits of Appellant's insufficiency claim. *See id.*

"[a]lthough the Commonwealth argued that robbery was the **motive**, that is inconsistent with the facts that the decedent still had rings, a bracelet and cash on him." ***Id.*** (emphasis added). Appellant states "[t]he homicide conviction rests entirely on [A]ppellant's exclusive possession of the firearm before and after the killing . . . ." ***Id.*** at 13. We find no relief is due.

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. . . .
>
> \* \* \*
>
> When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt.

***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1235-36, 1237 (Pa. 2007) (citations and quotation marks omitted).

Section 2502(a) of the Crimes Code defines first degree murder:

> **(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S. § 2502(a).

Our Pennsylvania Supreme Court has stated:

In order to sustain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill, *i.e.*, the killing was performed in an intentional, deliberate, and premeditated manner. Specific intent may be established through **circumstantial evidence**, **such as the use of a deadly weapon on a vital part of the victim's body**.

*Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (citations omitted and emphasis added). "[P]roof of a **motive is not necessary** to establish a specific intent to kill." *Commonwealth v. Robinson*, 364 A.2d 665, 669 (Pa. 1976) (emphasis added).

The trial court found the evidence was sufficient to establish that Appellant killed Fernandez. The court opined:

The testimony of multiple witnesses established that [Appellant] was present in The Black Pumpkin the night that Parran's firearm was stolen. Parran testified that [Appellant] was the only individual with the opportunity to steal the weapon. Both the driver of the Grand Marquis and a fellow passenger testified that [Appellant] was present in the car when police pulled it over shortly after the group left the bar. Those same individuals, as well as Officer Gorman, testified that [Appellant] fled from the vehicle. Officer Gorman subsequently identified [Appellant] as the individual who had shot him in the shoulder after being shown a photo array containing [Appellant's] photo. **Ballistics analysis confirmed that Parran's stolen firearm was used in Officer Gorman's shooting. Tillie Moless testified that [Appellant] had a firearm in his possession for the entirety of his stay at her house,** keeping it either in his hands or in his belt. **Ballistics analysis further confirmed that this same firearm was used in the early morning hours of December 21,2010 to shoot and kill Fernandez in his home.** On December 22, 2010, **the day after Fernandez's shooting, this firearm was in**

- 11 -

**[Appellant's] possession when SWAT officers entered the basement and engaged [Appellant] in a shoot-out and standoff. A forty-seven minute video of the standoff clearly showed [Appellant] possessing Parran's handgun.** After the shootout, that handgun was seized by police, allowing **ballistics analysis that not only tied that firearm to the shooting of Fernandez, but also to the prior shooting of Officer Gorman, and the subsequent shooting of SWAT officers Binns and Whalen.** That [Appellant] possessed and used the murder weapon, both before and after the murder was compelling evidence that he shot Fernandez.

Moreover, there was additional compelling evidence to establish that [Appellant] was the killer. **Pictures taken from the Sugar House Casino surveillance cameras clearly showed Fernandez wearing a pair of diamond clustered earrings and a watch, all of which were missing after his death. The video of the standoff the day after the murder showed [Appellant] wearing an identical pair of diamond cluster earrings and watch.** The testimony of Detective Rossiter established that this jewelry was taken into the possession of Temple University Hospital when [Appellant] was receiving medical care. These same pieces of jewelry were released to [Appellant's] mother, who still had the earrings when police arrived with a seizure warrant. The watch was later recovered where [Appellant's] mother had taken it for repair. All pieces of jewelry were positively identified by Ms. Bode upon their recovery as being the jewelry belonging to Fernandez.

. . . **Evidence of [Appellant's] intent to kill may be inferred from his shooting Fernandez three times in the chest.**

Trial Ct. Op. at 8-10 (citations omitted and emphases added).

The trial court found that "there was clearly sufficient evidence for a fact finder to conclude that [Appellant killed] Fernandez in the early morning hours of December 21, 2010." Trial Ct. Op. at 10.

Appellant's claim that the Commonwealth failed to prove motive is meritless. ***See Robinson***, 364 A.2d at 669. Appellant's contention that the earrings and watch were not distinctive in unavailing. It is not for this court to substitute its judgment for that of the fact-finder. ***See Ratsamy***, 934 A.2d at 1235-36, 1237. A conviction for first-degree murder can be sustained based upon circumstantial evidence where a deadly weapon was used on a vital part of the decedent's body. ***See Ramtahal***, 33 A.3d at 607. We find no relief is due. ***See Ratsamy***, 934 A.2d at 1235-36; ***Widmer***, 744 A.2d at 751.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/9/2015