J-S35027-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ABDUL HOLMES | |
| Appellant | No. 1651 EDA 2019 |

Appeal from the Judgment of Sentence Entered May 10, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0009947-2017

BEFORE:  BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 19, 2020**

Appellant Abdul Holmes appeals from the May 10, 2019 judgment of sentence entered in the Court of Common Pleas of Philadelphia County ("trial court"), following his jury convictions for aggravated assault, possessing an instrument of crime ("PIC"), recklessly endangering another person ("REAP"), firearms not to be carried without a license, and carrying firearms on public streets in Philadelphia.[1]  Upon review, we affirm.

In connection with a public shooting that resulted in the injury of a minor, Appellant was charged with, *inter alia*, the above-mentioned crimes.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 907(a), 2705, 6106(a)(1), and 6108, respectively.

The case eventually proceeded to a jury trial, which was held *in absentia*.[2]

The trial court summarized the evidence adduced at trial as follows:

> At trial, the Commonwealth first presented the testimony of Philadelphia Police Officer Edward Daly. Officer Daly testified that, on September 29, 2017 at approximately 7:45 p.m., he was on patrol with his partner, Officer Celce, when a radio call was broadcast for "person with a gun at the intersection of 24th and Norris Streets. Officer Daly and his partner, who were only two blocks away, arrived at the scene shortly after the call came through. Upon arrival, Officer Daly encountered a crowd of approximately 10 people, who directed him to the corner property at [XXXX] West Norris Street. There, he encountered a six-year-old gunshot victim, [J.A. (the "victim")]. [The victim] was "bleeding profusely from the shoulder" and "crying a lot". Accordingly, Officer Daly did not wait for an ambulance but placed [the victim] in his cruiser and immediately transported him to the hospital for emergency treatment.
>
> Philadelphia Police Detective Michael Livewell next took the stand for the Commonwealth. Detective Livewell testified that, on September 29, 2017, he was assigned to investigate a shooting that occurred earlier that evening on the corner of 24th and Norris Streets. Upon arrival, Detective Livewell canvassed the scene for ballistics evidence. He searched North and West of the intersection, because shots were reported as being fired in a southbound direction on 24th Street, and there was a school yard to the north/northwest of the intersection. Detective Livewell did not find any fired cartridge casings ("FCCs"), but he did hear a "hissing" sound from the tire of a nearby car. Upon further inspection the Detective believed that the tire was punctured by a bullet.
>
> Detective Livewell surveyed neighbors throughout the area on the night of September 29 and early morning hours of September 30, 2017, to no avail. Essentially, everyone he spoke with stated that they had "heard the gunshots" but "didn't see anything". He testified that the most fruitful information came from a Tanita Lark, who lived at 2009 North 24th Street (just north

---

[2] On the day of jury selection, Appellant absconded from the courtroom.

of the intersection).  Although Ms. Lark, too, heard the gunshots but did not see anything -- she stated that she became worried about her son, Jasun Lark, who had gone outside just before the shots rang out.

The Commonwealth next presented the testimony of the young gunshot victim, [J.A.].  [The victim], who was seven years old at the time of trial, testified that on the evening of the shooting, he was at his grandmother's house at 2347 West Norris Street waiting for his dad to take him and his brother, [S.], to his dad's house.  When his father arrived, [the victim] and [S.] went outside to play "tag" with other kids before they left.  When they were about to leave, several gunshots rang out and [the victim], who was standing next to his dad at the stop sign, got shot in the left shoulder.  [The victim also testified that after the police took him to the hospital he had surgery to remove the bullet from his shoulder; the wound left him with a scar, which he displayed to the jury.]  [The victim]'s dad immediately pulled him into the house; he was bleeding from the shoulder and "everyone was crying", including his father.  Finally, [the victim] testified that just prior to the shooting he saw someone, whom he did not recognize, wearing a black hoodie on 24th Street, and that he never saw that person again.

[The victim]'s 13-year-old brother, [S.], testified next for the Commonwealth.  According to [S.], on the evening of September 29, 2017, he was playing outside his grandmother's house with [the victim] and some other kids, waiting for his dad to pick them up.  After his father arrived, they were about to depart for his house when he heard four or five gunshots and saw "flashes" coming from 24th Street.  The next thing he knew, he was being pulled into the home, and saw his little brother lying on the floor with a gunshot wound.  [S.] testified that his dad then went outside to see who was shooting, and returned a short time later and called the police.

[S.] also testified that he knows Jasun Lark from the neighborhood, and he saw Jasun walking on 24th Street around the time of the shooting.  He further testified that Jasun, who was 18 or 19 years old, was friends with another neighbor, Nikki Mitchum.  Finally, [S.] testified that within a few hours of the shooting, he went to the police station with his aunt and gave a statement to detectives.

The Commonwealth next called the [the victim]'s father, [J.A. (the "father")], to the stand. The father testified that on the evening of the shooting, he was standing outside with his children on the corner of 24th and Norris Streets, when four or five gunshots rang out from the direction of Diamond Street. The father immediately pushed his kids inside their grandmother's house; he instinctively went back outside, at which time he saw a male in a grey hoodie running from the same direction of the gunshots. [The father] testified that he had not yet realized that his son had been shot. Rather, it was not until he went back inside the home a second time that he saw his son lying on the floor, bleeding. [The father] ripped [the victim's] shirt off him in order to ascertain where he was bleeding from, and called 9-1-1. Two police officers arrived and transported [the victim] and him to the hospital. He provided a statement to detective on the following day. Finally, [the father] testified that, ever since the shot, his son mentally has never been the same. [He] lashes out more than he used to . . . [H]e is just not like [how] he used to be."

Next, Philadelphia Police Detective John McIver testified that he executed a search warrant on a vehicle that was towed from the scene of the shooting. He observed that the vehicle—a 2015 black Honda Accord—had a flat front passenger tire. Detective McIver removed the tire, from which he extracted a fired projectile bullet. He secured the bullet via property receipt and submitted it to the Firearms Identification Unit for further testing.

The Commonwealth next presented its expert ballistician, Philadelphia Police Officer Mark Wilusz. Officer Wilusz testified that he analyzed the two projectiles recovered in this case, namely, the bullet recovered from [the victim] and the bullet recovered from the Honda Accord's tire, both of which were "38/357 caliber. Due to a significant amount of damage to surface of the bullets, there "wasn't enough microscopic marks of value" to determine whether they were or were not fired from the same gun.

The Commonwealth next called Jasun Lark, who testified that he lives at 2009 North 24th Street, the house next door to [the victim]'s grandmother's house, where [the victim] and his siblings used to live. Mr. Lark testified that he knew Appellant by the nickname "Dro", and had known him for several years from the neighborhood, as Appellant lived around the corner from him.

On the evening of September 29, 2017, Mr. Lark was on his front porch when he heard two gunshots ring out. ***Remarkably, in contrast to both his video-recorded statement to detectives and grand jury testimony in which he unequivocally identified Appellant as the shooter, Mr. Lark developed a profound case of amnesia at trial and claimed that he did not see who had shot [the victim***]. Rather, he claimed that his video-recorded statement and grand jury testimony implicating Appellant comprised "a lie". Mr. Lark acknowledged that after his grand jury testimony, he stopped going to school and went into hiding, and that his parents prevented him from going to court because they did not want to see anything happen to him. He also was asked about an incident at 30th and Susquehanna on October 29, 2018, in which "someone fired 20 to 30 shots at him", and acknowledged that he was then-currently (at the time of trial) incarcerated for repeatedly failing to appear in court in this case. Against this backdrop, Mr. Lark's video-recorded statement was played along with a transcript for the jury.

Mr. Lark nonetheless claimed that he did not identify Appellant -- or anyone else -- at the grand jury proceeding, and that he did not remember anything from the day of the shooting, prompting the recitation of his sworn testimony before the grand jury:

Q. Did you identify anyone at the grand jury?

A. No.

Q. You didn't identify anyone to the grand jury as the shooter?

A. No.

Q. Okay. All right.

Q. Did you tell Kathy Martinez, the DA when you testified, did you tell her what you saw that day of the shooting?

A. I don't really remember that day.

Q. You don't remember the day of the grand jury what you told her?

A. No.

Q. All right. So can you flip to Page 13 on C-11?

Are you on there? Let me know when you have it.

A. I'm on there.

Q. All right. Scroll down to line 19. Do you see it?

A. Yes.

Q. And you were asked: Did you also look at a photograph of Dro?

By Kathy Martinez, correct?

A. Yes.

Q. Your response was yes?

A. Yes.

Q. And then you were asked: Did you sign that photo? And your response was yes?

A. Yes.

Q. And then you were asked on Line 23: When you signed that photo of Dro, why did you sign that photo of Dro?

**And your answer was**: Because that is who I saw pull the weapon out and shoot [the victim]. Is that what it says there?

A. Yes.

Q. Okay. And then you were asked: Okay. Did you sign that photograph?

A. Yes.

Q. And your response was "yes" there. Correct?

A. Yes.

Q. And then the next question was: Did you also write the name Dro on top of that photograph? **And your response was:** Yes. Correct?

A. Yes.

. . . .

Q. . . . That's your signature [on the photograph]?

A. Yes.

Q. Is that what it says there?

A. Yes.

. . . .

Q. At the top, Line 1, you were asked: Did you date it as well? **And your response was:** Yes. Correct?

A. Yes.

Q. And the next question was: What is the date? **And your answer was:** 9/30/17. Correct?

A. Yes.

. . . .

Q. All right. Now, you said you don't remember if you told Ms. Martinez whether or not you saw the shooting

A. No. I don't remember.

Q. You don't remember. Would it refresh your recollection to read this, to read certain portions of this to see whether or not you remember?

A. No.

Q. It wouldn't refresh your recollection? Okay. So can you flip to Page 6 then down to Line 9. Let me know when you're there.

A. I'm there.

Q. And you were asked: Could you tell what, if anything, happened when you got to your house? **And your response was**: I was coming out of my aunt's house, and I was walking towards the corner, and I see [the victim] and his dad and his two brothers on the corner. As I'm walking toward my house, I walked past the four guys. I was walking toward my house, and I see two guys pull up with black hoodies, and they pull out guns. That is what it says there, correct?

A. Yes.

 . . . .

Q. Do you remember being asked: Okay. Can you describe these two guys? What were they wearing? Do you see that?

A. Yes.

Q. And your response was: One had a rubber band in this hair. He had dreads, dreadlocks, and he had on all black Nike sweat suit with New Balance '990's. And his friend had a box cut with a curly top with tattoos on his face. That is what is says there, correct?

A. Yes.

 . . . .

Q. And on Page 8, Line 22, you were asked: Do you recognize him? **Your answer was:** Yes. That's what it says there, correct?

A. Right.

Q. Then you were asked on Line 24: And what is his name? And Line 25 it says, I know him by Dro.

A. Yes.

. . . .

Q. So Line 12, Page 10 you were asked: Can you tell everyone what you saw Dro – or when you saw Dro, what is anything, did you see him doing? **And your response says:** I seen him pull out a gun, aim it at the corner where the gentlemen were standing, let off two shots. He took off running through the schoolyard. That's what it says there, correct?

A. Correct.

Q. And then you were asked: You saw him pull out a gun. Where did you see him pull the gun from? And your response was: From his hip, his left side. Correct?

A. Yes.

Mr. Lark goes on to admit to the truth of everything he told Detective Rocks in his interview wherein he identified Appellant as the shooter. He also acknowledged making prison phone calls to Appellant wherein he told Appellant that he was going to "make sure that he was taken care of because he wasn't going to come to court. And finally, Mr. Lark acknowledged making phone calls to his girlfriend, Nikki Mitchum, and his brother, Mark Lark, during which Mr. Lark indicated that the police were just mad "because I ain't telling on the boy" and "I ain't no fucking rat, bro". He further admitted to actually meeting up with Appellant to assure him that he would not appear in court. As Mr. Lark put it: "I . . . told the boy, I am going to get booked before you get booked."

Philadelphia Police Detective Michael Rocks next took the stand for the Commonwealth. Detective Rocks testified that, on September 30, 2017, he and his partner, Detective Leonard Williams, went to 2009 North 24th Street to speak with Jasun Lark regarding the shooting incident. Mr. Lark was not home at the time, so they spoke with his mother, however he did arrive while they were there and agreed to give a statement. Detective Rocks

testified that at no point did he threaten Mr. Lark, and Mr. Lark was never a suspect in this case. Before transporting him to Central Detectives, Detective Rocks and his partner took Mr. Lark to Wawa to get some food.

Detective Rocks testified that prior to the interview, he engaged in an informal conversation with Mr. Lark about the incident. Mr. Lark stated what he knew about it, to wit, that he saw person by the nickname "Dro" doing the shooting that evening. Detective Rocks retrieved a photograph of "Dro" a/k/a Abdul Holmes, and Mr. Lark positively identified him. Mr. Lark then partook in a more formal interview, which was recorded on video. During the interview, Mr. Lark once again unequivocally identified Appellant as the shooter. Detective Rocks testified that Mr. Lark provided the interview voluntarily, and that based on his extensive experience, Mr. Lark did not remotely appear to be under the influence of intoxicating agents.

Detective Rocks additionally testified that, following the interview, he gave Mr. Lark his card and offered him a ride home. Mr. Lark accepted the ride but asked to be dropped off several blocks away from his home. Finally, Detective Rocks testified that Mr. Lark showed up on his own volition and testified before the grand jury, and did not express any reservation about being there.

Philadelphia Police Detective Edward Keppol testified next for the Commonwealth. Detective Keppol testified that he is a member of the "shooting team" of the Special Investigation Unit, and he was assigned as the lead detective in this case. As part of his investigation, Detective Keppol surveyed the scene for FCCs and projectiles. No FCCs were recovered, leading him to conclude that the gunman used a revolver (which does not eject FCCs). As for projectiles, one bullet was recovered from a car's tire and a second bullet was recovered from [the victim]'s shoulder. As a result of his investigation, Detective Keppol applied for, and obtained, a warrant for Appellant's arrest, and a warrant to search his residence at 2240 Edgley Street in Philadelphia. Aided by the SWAT Unit, Detective Keppol executed the warrant on October 1, 2017 at approximately 3:00 a.m. Appellant was present inside the residence and taken into custody.

Next, Philadelphia Police Officer Anthony Mooney testified that on October 29, 2018 at approximately 9:15 p.m., he was on

patrol at 30th and Ridge Avenue, when he heard 20 to 30 gunshots coming from the area of 30th and Susquehanna Avenue (one block north). As he traveled northbound on Ridge Avenue, he encountered Mr. Lark running from Corlies Street toward him. Officer Mooney stopped Mr. Lark, who appeared to be scared and out of breath. Mr. Lark gave the officer his brother's name, Mark Lark, and stated that he had heard gunshots and started to run. Upon ascertaining from a witness that Mr. Lark was not the shooter, Officer Mooney released him.

Officer Mooney testified that he did not know that Mr. Lark was an eyewitness in this case and had been dodging court.[3] On the following day, Officer Mooney was asked by the District Attorney's Office to try to locate Mr. Lark and bring him to court. On October 31, 2018, Officer Mooney located Mr. Lark at 25th and Berks Streets. Mr. Lark again gave him the name "Mark Lark", but after the officer showed him a photograph with his name on *it,* Mr. Lark admitted that he was scared to give his real name because he did not want to go to court. Officer Mooney then took Mr. Lark before the Honorable Scott Di Claudio, who issued another subpoena with a new trial date.

The Commonwealth next presented testimony of Ms. Jaleesa Brown, who is a court clerk with the Office of Judicial Records at the Criminal Justice Center in Philadelphia. Ms. Brown testified that she was the assigned court clerk in Courtroom 902 on April 2, 2019. She testified that Appellant appeared for jury selection that day, but during a break in the proceedings, he left

---

[3] By way of background, our review of the record indicates, and the Commonwealth confirms, that Mr. Lark repeatedly failed to appear for trial. On December 3, 2018, when Mr. Lark "once again failed to appear for trial,"

the Commonwealth requested a one-day continuance for police to locate him. Because Mr. Lark could not be found, the Commonwealth moved for *nolle prosequi* of the charges against [Appellant]. The court granted the Commonwealth's motion on December 4, 2018. Police subsequently located Mr. Lark. On January 25, 2019, the court found him in contempt for failing to appear at trial. That same day, the Commonwealth filed a motion to vacate the entry of *nolle prosequi*. The court granted the motion on February 8, 2019.

Commonwealth's Brief at 7.

without the [c]ourt's permission and failed to return. Ms. Brown then notified [the court], which issued a bench warrant.

Finally, the Commonwealth presented the testimony of Probation Officer Robert Fitzsimmons, who explained that he is a pretrial officer who handles defendants who are placed on house arrest. Officer Fitzsimmons testified that Appellant had been on pretrial house arrest awaiting trial, with permission to leave the residence only to attend court. Officer Brown explained that house arrest monitoring does not employ GPS; rather, it only alerts when the individual crosses the perimeter of the house. On April 2, 2019 Appellant left his house to attend court and then never returned.

Appellant's counsel presented the testimony of Appellant's friend, James N. Bennett. Mr. Bennett testified that, on the evening of September 29, 2017, he was hanging out with Appellant, his longtime friend, on the corner of 23rd and Diamond Streets. At some point between 7:00 and 8:00 p.m., gunshots rang out so they walked over to 24th and Edgley Streets "because it sounded like the shots came from around there." When they got there, police arrived but did not stop him or Appellant; after "about two minutes" he and Appellant "went [their] separate ways".

Despite possessing this information, Mr. Bennett testified that he did not come forward with this information about his good friend at any time following the shooting. Although Mr. Bennett claimed that he gave a statement to police three months prior to trial, on cross-examination he admitted that he did not give a statement to detectives until March 27, 2019, *i.e.*, less than a week before trial.

Prior to resting, the defense introduced stipulated testimony, namely, that if called: (1) Philadelphia Police Officer Robert Zona would testify that, on the night of September 29, 2017 at approximately 8:00 p.m., he stopped a 13-year-old black male in the vicinity of 24th and Edgley Streets in response to flash description of black male with grey hoodie; and (2) defense private investigator, Bill Carey, would testify that he attempted to talk to Jasun Lark while he was in custody on March 30, 2019, but Mr. Lark refused to meet with him.

- 12 -

> Based on all the foregoing evidence, the jury found Appellant guilty of aggravated assault, PIC, REAP, firearms not to be carried without a License, and carrying firearms on public streets in Philadelphia. On May 10, 2019, following a hearing on the Commonwealth's motion to proceed *in absentia,* the court imposed [upon Appellant an aggregate sentence of 19½ to 39 years' imprisonment.]

Trial Court Opinion, 12/4/19, at 1-5 (record citations, some footnotes and unnecessary capitalizations omitted) (some emphasis in original; other added). Appellant did not file any post-sentence motions. He timely appealed his judgment of sentence. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, raising three assertions of error. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant presents three issues for our review. First, he argues that the "trial court's refusal to allow [Appellant] to hire an attorney of his choosing violate[d] his right to counsel under the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution." Appellant's Brief at 5. Second, Appellant claims that "the evidence was [in]sufficient to sustain [his] convictions for aggravated assault and related offenses" because "the sole evidence offered against him was the recanted prior inconsistent statement of [Mr. Lark] that was so unreliable that it must be rejected as a matter of law." ***Id.*** In essence, even though couched as a sufficiency claim, we construe it as challenging the trial court's weight of the evidence and credibility determinations. Third, he argues that the trial

court erred in permitting "the jury to review transcripts of Jasun Lark's video interview during their deliberations in violation of Pa.R.Crim.P. 646(C)(1) where the video-taped statement was the only evidence implicating [him.]" *Id.* We address the issues in turn.

Appellant's first argument seemingly implicates his right to counsel. He claims that the trial court erred in refusing to grant his request, made one day before trial, to re-hire Attorney Todd Henry, who previously had represented him in this case. *Id.* at 14. At the core, however, what Appellant is challenging is the trial court's refusal to continue trial—on the eve of trial—in order to permit Appellant to re-hire Attorney Henry.

It is well-settled that "[t]he grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion." *Commonwealth v. Ross*, 57 A.3d 85, 91 (Pa. Super. 2012) (citation omitted), *appeal denied*, 72 A.3d 603 (Pa. 2013). An abuse of discretion "is not merely an error of judgment; rather, discretion is abused when 'the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record.'" *Id.* (citation omitted). "A bald allegation of an insufficient amount of time to prepare will not provide a basis for reversal of the denial of a continuance motion." *Id.* (citation omitted). Instead, an appellant "must be able to show specifically in what manner he was unable to prepare his defense or how he

would have prepared differently had he been given more time." *Id.* "We will not reverse a denial of a motion for continuance in the absence of prejudice." *Id.* (citation omitted).

As we recently explained in *Commonwealth v. Broitman*, 217 A.3d 297 (Pa. Super. 2019):

> Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee a defendant's right to counsel. [*Commonwealth v.*] *McAleer*, 748 A.2d [670, 673 (Pa. 2000)]. "In addition to guaranteeing representation for the indigent, these constitutional rights entitle an accused to choose at his own cost and expense any lawyer he may desire." *Id.* (internal quotation marks and citation omitted). However, a defendant's constitutional right to counsel of his choice is not absolute and "must be weighed against and may be reasonably restricted by the state's interest in the swift and efficient administration of criminal justice." *Commonwealth v. Robinson*, 364 A.2d 665, 674 (Pa. 1976) (internal quotation marks omitted).
>
> This Court cannot permit a defendant to utilize this right "to clog the machinery of justice and hamper and delay the state in its efforts to do justice with regard both to him and to others whose rights to speedy trial may thereby be affected." *Id.* A defendant's right to choose private counsel "must be exercised at a reasonable time and in a reasonable manner." *Commonwealth v. Rucker*, 761 A.2d 541, 542-43 (Pa. 2000) (citation and emphasis omitted).
>
> In *Commonwealth v. Prysock*, 972 A.2d 539 (Pa. Super. 2009), this Court set forth the following factors to consider on appeal from a trial court's ruling on a continuance motion to obtain private representation: (1) whether the court conducted an extensive inquiry into the underlying causes of defendant's dissatisfaction with current counsel; (2) whether the defendant's dissatisfaction with current counsel constituted irreconcilable differences; (3) the number of prior continuances; (4) the timing of the motion for continuance; (5) whether private counsel had actually been retained; and (6) the readiness of private counsel

to proceed in a reasonable amount of time. *Prysock*, 972 A.2d
at 543.

*Broitman*, 217 A.3d at 299-300.

Here, our review of the record reveals that Attorney Henry entered his appearance in this case on November 14, 2017. On January 28, 2019, Attorney Henry filed a motion to withdraw as counsel. Attorney Henry claimed that he had had no contact with Appellant since the Commonwealth moved for *nolle prosequi* of the charges on December 4, 2018 and that "[a]ny attempts to reach [Appellant] have gone unanswered." Motion to Withdraw, 1/28/19, at ¶ 2. Attorney Henry further claimed that he received "notice that the Commonwealth is seeking to vacate the *nolle pros*." *Id.* ¶ 3. Attorney Henry claimed that he had fulfilled his "obligation to [Appellant]" and wished to seek "leave to withdraw" from this case." *Id.* ¶¶ 4-5.

On January 29, 2019, the court appointed Attorney Donald Bermudez to represent Appellant. On February 8, 2019, trial was scheduled for April 1, 2019. On March 1, 2019, the trial court conducted a hearing on a Pa.R.Crim.P. 600 motion filed by Attorney Bermudez. It was not until April 1, 2019, on the day of jury selection and more than two months following Attorney Bermudez' appointment, that Appellant first expressed a wish to re-hire Attorney Henry as trial counsel. At the jury selection, the following exchange occurred:

> THE COURT: All right. So are there any other trial issues, Mr. Bermudez, that you want to raise at this point or any other issues?
>
> MR. BERMUDEZ: Just a request. I feel it is my duty as court appointed to—he would like time to rehire Mr. Henry. It is his

right to choose his counsel. I understand that I am attached. I am ready to proceed, but I do feel it appropriate to make that request on behalf of [Appellant].

THE COURT: All right. Well, Mr. Holmes, you have had more than enough time to see if Mr. Henry could represent you. This case, I believe, was—well, the *nolle pros* in this case was entered on December 4, 2018. Mr. Henry made it clear that he could no longer represent you on this case back in January-

MR. HOJNOWSKI: January 28th, Your Honor.

THE COURT: --of this year. So now, it's April, and there have been a number of listings in between. This is the first time that anyone is suggesting that you wish to hire—rehire Mr. Henry.

Your trial date is tomorrow, sir. So unless I were to hear from Mr. Henry that somehow he has been retained to represent you, I would not entertain that type of [continuance] request the day before trial.

THE DEFENDANT: Okay, miss. Because I talked to –

THE COURT: Okay, Judge.

THE DEFENDANT: Yes. Sorry, Judge. I talked to Mr. Henry, and around the time when I had the motion hearing, he was telling me, like, just see if the motion is granted. Then if it don't get granted, you can hire me. And I've been trying [to] contact him. ***I've been trying to contact him. I can't even get in contact with him***.

THE COURT: Oh, Mr. Henry is very easy to contact, sir. Mr. Henry has a very thriving practice and he is very easy to contact.

So at this point in time, it was represented to me that you could no longer afford private counsel. Mr. Henry is very expensive, I'm sure. And for that reason, Mr. Bermudez was appointed to represent you. And have you discussed your defense with Mr. Bermudez?

THE DEFENDANT: Yes.

THE COURT: And he is, in fact, ready to represent you on this case. You understand  that?

- 17 -

THE DEFENDANT: Yes.

THE COURT: All right. I understand, maybe your desire would be to have Mr. Henry, but you would have had to have made those arrangements and have him ready to go and ready to try this case, which has not happened for the past four months. So I am going to—this case will be ready to go tomorrow morning.

N.T., Trial, 4/1/19, at 9-12 (emphasis added).

Instantly, based on the record before us, we cannot conclude that the trial court abused its discretion in denying Appellant's continuance request for purposes of re-hiring Attorney Henry. The trial court found that Appellant failed to act promptly and "waited until the last possible second" to re-hire Attorney Henry. Trial Court Opinion, 12/4/19, at 17. The court reasoned that "Appellant appeared for jury selection on April 1, 2019 (with trial slated to commence on the following morning), and despite having months to prepare for trial and retain private counsel, he indicated that he 'would like more time' to rehire [Attorney Henry] as his counsel." *Id.* The court explained that "Appellant's dilatory behavior resulted in the forfeiture of the right to counsel of his choosing." *Id.* at 19. Moreover, the trial court pointed out that "Appellant absented himself from the proceedings in this case. Upon doing so, [he] completely lost the ability to assert whom 'he preferred' as his counsel while he was on the lam." *Id.* The court also observed that Appellant "does not contend that his court-appointed counsel rendered ineffective assistance at trial, nor, in light of the record, could he. As such, even if Appellant had not forfeited his right to counsel—and plainly he did—he still would be unable

- 18 -

to demonstrate actual prejudice in this case." *Id.* Indeed, at no point did Appellant provide the trial court with a reason for wishing to re-hire Attorney Henry or that the denial of the requested continuance rendered him unable to prepare his defense or prejudiced him any way.

Appellant simply waited until the eve of trial to request a continuance to re-hire Attorney Henry, with whom he admitted—on the record—to having no contact. As the trial court aptly noted, Appellant's continuance request was dilatory—an attempt to clog the machinery of justice.[4] This case had been pending for almost 1½ years, the trial court appointed new counsel nearly two months prior to trial, and Appellant waited until the eve of trial to request a continuance to re-hire Attorney Henry. Under the circumstances of this case, the trial court did not abuse its discretion in denying Appellant's last-minute continuance request. *See Commonwealth v. McCool*, 457 A.2d 1312, 1314-15 (Pa. Super. 1983) (no abuse of discretion in denying defendant's continuance request to obtain private counsel where defendant made no

_____

[4] To the extent Appellant relies on *Commonwealth v. Rucker*, 761 A.2d 541 (Pa. 2000), such reliance is misplaced. Unlike in this case, there the defendant had **retained** private counsel who had been working on the case for months and was prepared to go to trial immediately. Moreover, unlike in this case, there the private counsel, in a written motion, informed the court that he "is an experienced trial lawyer who specializes in criminal defense, that he met with [the] appellant at least ten times, that he developed a special rapport and trust with [the] appellant, that he fully reviewed all case materials, and that he completely prepared the defense of [the] appellant's case." *Rucker*, 761 A.2d at 543.

efforts to retain counsel until the night before trial); *see also Commonwealth v. Novak*, 150 A.2d 102, 109-10 (Pa. 1959) (holding the defendant's request to change counsel on the day of trial was properly denied).

We next address Appellant's second issue, implicating the weight of the evidence.[5]  Appellant argues that the principal evidence against him at trial— the testimony of Mr. Lark—was unreliable and, as a result, must be rejected as a matter of law.  This issue, however, is not preserved for appellate review. Under Pa.R.Crim.P. 607, a challenge to the weight of the evidence generally must be preserved in a post-sentence motion.  "As noted in the comment to Rule 607, the purpose of this rule is to make it clear that a challenge to the

---

[5] As this Court has explained:

> On this issue, our role is not to consider the underlying question of whether the verdict was against the weight of the evidence. Rather, we are to decide if the trial court palpably abused its discretion when ruling on the weight claim.  When doing so, we keep in mind that the initial determination regarding the weight of the evidence was for the factfinder.  The factfinder was free to believe all, some or none of the evidence.  Additionally, a court must not reverse a verdict based on a weight claim unless that verdict was so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Habay*, 934 A.2d 732, 736-37 (Pa. Super. 2007) (internal citations omitted), *appeal denied*, 954 A.2d 575 (Pa. 2008).  "[A] trial court's denial of a post-sentence motion 'based on a weight of the evidence claim is the least assailable of its rulings.'"  *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012) (quoting *Commonwealth v. Diggs*, 949 A.2d 873, 880 (Pa. 2008)).

weight of the evidence must be raised with the trial judge or it will be waived."

***Commonwealth v. Gillard***, 850 A.2d 1273, 1277 (Pa. Super. 2004), ***appeal denied***, 863 A.2d 1143 (Pa. 2004). A claim challenging the weight of the evidence generally cannot be raised for the first time in a Rule 1925(b) statement. ***Commonwealth v. Burkett***, 830 A.2d 1034 (Pa. Super. 2003). An appellant's failure to avail himself of any of the methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion. ***Id.*** Instantly, Appellant failed to challenge the weight of the evidence at sentencing. Additionally, as mentioned, he did not file any post-sentence motions. Accordingly, his weight of the evidence claim is waived.[6]

---

[6] Even if this issue were preserved, Appellant still would not be entitled to relief. First, Appellant essentially attacks the jury's weight and credibility determination, and invites us to accept his proffered version of the facts. We decline the invitation. It is settled that we may not substitute our judgment for that of the factfinder—whether a jury or the trial court—because it is the province of the factfinder to assess the credibility of the witnesses and evidence. ***See Commonwealth v. DeJesus***, 860 A.2d 102, 107 (Pa. 2004); ***Commonwealth v. Johnson***, 668 A.2d 97, 101 (Pa. 1995) ("an appellate court is barred from substituting its judgment for that of the finder of fact."). Second, as the record reveals, Appellant did not object at trial to the Commonwealth's introduction of Mr. Lark's prior inconsistent statements. But assuming he had, Appellant still would not have obtained relief. Prior inconsistent statements are always admissible for impeachment purposes, but also may be admitted as substantive evidence when the statement was given in reliable circumstances and where the declarant is subject to cross-examination. ***See Commonwealth v. Carmody***, 799 A.2d 143, 148 (Pa. Super. 2002) (recognizing that "a prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if it meets additional requirements of reliability").

Finally, we turn to Appellant's claim that the trial court abused its discretion in permitting the jury to review during deliberations the transcripts of Mr. Lark's video-taped interview. As the Commonwealth points out, this claim is waived. Commonwealth's Brief at 25. It is settled that an appellant's "failure to raise a contemporaneous objection to evidence at trial waives that claim on appeal." ***Commonwealth v. Thoeun Tha***, 64 A.3d 704, 713 (Pa. Super. 2013) (citation omitted); ***see Commonwealth v. Baumhammers***, 960 A.2d 59, 73 (Pa. 2008) (to preserve issue for appellate purposes, party must make timely and specific objection to ensure trial court has opportunity to correct alleged error); ***Keffer v. Bob Nolan's Auto Service, Inc.***, 59 A.3d 621, 645 (Pa. Super. 2012) ("one must object to errors, improprieties or irregularities **at the earliest possible stage** of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.") (citations omitted) (emphasis added); ***see also*** Pa.R.E. 103(a) (providing that an "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless . . . a timely objection . . . appears of record."); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

In sum, we conclude that the trial court did not abuse its discretion in denying Appellant's eleventh-hour continuance request to re-hire Attorney

Henry and that Appellant failed to preserve his second and third issues for our review.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/20